[Cite as *State v. Nowlin*, 2012-Ohio-4923.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| STATE OF OHIO | : | W. Scott Gwin, P.J. |
|  | : | William B. Hoffman, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
|  | : |  |
| -vs- | : | Case No. CT2012-0015 |
|  | : |  |
|  | : |  |
| TERRELL M. NOWLIN | : | O P I N I O N |
|  |  |  |
| Defendant-Appellant |  |  |

CHARACTER OF PROCEEDING:         Criminal Appeal from Muskingum
                                 County Court of Common Pleas Case
                                 No. CR2010-0155

JUDGMENT:                        Affirmed In Part, Reversed and
                                 Remanded In Part

DATE OF JUDGMENT ENTRY:          October 19, 2012

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

D. MICHAEL HADDOX                         DAVID SAMS
ROBERT L. SMITH                           P.O. Box 40
Assistant Prosecuting Attorney            West Jefferson, Ohio  43162
27 North Fifth Street
Zanesville, Ohio  43701

*Edwards, J.*

{¶1} Appellant, Terrell Nowlin, appeals a judgment of the Muskingum County Common Pleas Court convicting him of conspiracy to commit aggravated murder (R.C. 2923.01(A)(1)), conspiracy to commit kidnapping (R.C. 2923.01(A)(1)), kidnapping with a firearm specification (R.C. 2905.01(A)(2), R.C. 2941.145), aggravated murder with a firearm specification (R.C. 2903.01(A), R.C. 2941.145), three counts of tampering with evidence (R.C. 2921.12(A)(1)), and gross abuse of a corpse (R.C. 2927.01(B)). Appellee is the State of Ohio.

## STATEMENT OF FACTS AND CASE

{¶2} Heather Nowlin is the mother of a daughter, Markia, born December 13, 2008. Heather and appellant believed that appellant was the father of Markia. When Markia was an infant, she began to experience health problems. Doctors thought she might have sickle cell anemia and testing was performed to determine with certainty the identity of Markia's father. DNA testing proved that Tyler Hardin, not appellant, was the father of the child. Appellant became very upset over this turn of events.

{¶3} Heather and appellant contacted an attorney, who told them that the only way for appellant to be Markia's father was for appellant to adopt her, and the only way he could adopt Markia was if he married Heather and Tyler signed adoption papers. In order to make adoption of Markia possible, appellant married Heather in 2009. However, they did not live together as husband and wife. Appellant stayed one or two nights a week in Zanesville with his father and his father's girlfriend and the remainder of the week he lived in Columbus with his long-time girlfriend, Savanna, where he had

resided since 2006. Savanna knew about Markia, but did not know appellant had married Heather in order to adopt Markia.

{¶4} Heather took adoption papers to Tyler's house and told him if he signed them, he would not have to pay child support. He signed the papers, but withdrew his consent to the adoption when he discovered they were in fact adoption papers. Tyler filed an action to receive visitation with Markia and began seeing Markia. Appellant was not happy that Tyler was permitted to visit Markia.

{¶5} On July 10, 2010, Heather and her friend Alysia picked up Markia from visitation with Tyler at the home of a girl named Ta Ta. Heather told Tyler they were going swimming, and he asked if he could go along.

{¶6} Heather went home and had a conversation by telephone with appellant. She then met appellant in a driveway, where she noticed that appellant had a gun on his lap. They made plans for Heather to take Tyler to property owned by Paul Tipton.

{¶7} Heather and Alysia went to pick up Tyler to go swimming. Markia was with them. Appellant followed their vehicle to the Tipton property. Appellant was carrying a bucket when he got out of the car. He put down the bucket, put a gun to the car door and told Heather to get out of the car. Appellant opened the trunk of the car and retrieved a shovel.

{¶8} Tyler got out of the car and ran. Appellant threw down the shovel and tackled Tyler, telling Heather to leave. Heather, Alysia and Markia drove away with the doors and trunk of the car still open.

{¶9} Later that day, appellant met Heather at her home. He put a gun to her head and told her if he goes down, she is going with him. He told her that Tyler

wouldn't shut up so he shot him in the face. Tyler grabbed his face and "started crying like a little bitch." Tr. 676. Tyler got up and ran. Appellant shot him in the back and then suffocated him under water. Appellant told Heather if she told anyone, he would kill her. Because appellant had hit her in the past, she believed he would kill her.

{¶10} The next morning, Heather and appellant returned to the Tipton property to dispose of Tyler's body. Appellant went into the woods and came out telling Heather there was no body. He then told Heather he was "just playin'." They put trash bags on their hands and feet with duct tape and proceeded to the place where Tyler's body was laying in water in a culvert. They drug Tyler's body to a previously dug hole and put the body in the hole. Heather then returned to the car with Markia to wait for appellant.

{¶11} Appellant returned to the car. They placed the clothes they were wearing in a dumpster and then went to Burger King. They returned to Heather's apartment, where appellant took a nap. When he left, he took Markia with him, along with a rag and a bottle of bleach. He told Heather that if she told anybody, he was going to kill her, and reminded her that he had Markia with him.

{¶12} On July 17, 2010, Kim Saunders called the Zanesville police to report that her son Tyler Hardin had been killed and was buried in a shallow grave on a farm. She told police that Tyler had problems with Heather and appellant concerning Markia. Richard McCoy, Heather's father, was incarcerated in the county jail. Police spoke to McCoy, who told them that while on work release he saw his wife, who told him Heather may know something about Tyler going missing. Police allowed McCoy to leave prison in order to talk to Heather. He brought Heather to the police department 50 minutes later.

**{¶13}** Heather told police where Tyler was buried. Police found the body in a shallow grave on Paul Tipton's property. They saw a red shirt and black pants sticking out of the grave, as well as legs which animals had been eating. An autopsy revealed that Tyler Hardin had been shot once in the face, a non-fatal wound, and once fatally in the back.

**{¶14}** Appellant was arrested and interviewed in Columbus on July 18, 2010. He told police that Savanna had his gun and gave them her telephone number. Before they could use this information, other officers interviewed Savanna and she told them appellant asked her to put his gun in her father's safe. The gun which was used in the murder of Hardin was retrieved from Savanna's parents' home. Police interviewed appellant on July 20, 2010 and July 26, 2010, but he provided no information concerning the murder of Tyler Hardin.

**{¶15}** Heather agreed to testify against appellant and pleaded guilty to conspiracy to aggravated murder, kidnapping and tampering with evidence. She was sentenced to 25 years incarceration.

**{¶16}** Appellant was charged with one count of conspiracy to commit aggravated murder, one count of conspiracy to commit kidnapping, one count of kidnapping with a firearm specification, one count of aggravated murder with a firearm specification, four counts of tampering with evidence and one count of gross abuse of a corpse. The case proceeded to jury trial in the Muskingum County Common Pleas Court. He was convicted on all charges except one count of tampering with evidence.

**{¶17}** The trial court merged the conspiracy to commit aggravated murder conviction with the aggravated murder conviction, merged the conspiracy to commit

kidnapping conviction with the kidnapping conviction, and merged one count of tampering with evidence with abuse of a corpse. The State elected to proceed under the aggravated murder, kidnapping and tampering with evidence convictions. The trial court sentenced appellant to a term of eleven years incarceration for kidnapping, life without the possibility of parole for aggravated murder, three years incarceration for the firearm specification for aggravated murder, and 36 months on each of the three tampering with evidence convictions. The court ordered that all terms be served consecutively. The court later issued a nunc pro tunc entry to clarify that the court had merged the firearm specifications for kidnapping and aggravated murder.

{¶18} Appellant assigns five errors on appeal:

{¶19} "I. THE TRIAL COURT FAILED TO SUPPRESS STATEMENTS OF DEFENDANT-APPELLANT OBTAINED BY LAW ENFORCEMENT CONTRARY TO HIS RIGHTS UNDER THE STATE AND FEDERAL CONSTITUTIONS.

{¶20} "II. THE DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL BY THE ADMISSION OF PRIVILEGED ACTS AND COMMUNICATIONS CONTRARY TO OHIO LAW AND THE STATE AND FEDERAL CONSTITUTIONS.

{¶21} "III. THE DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL BY INSUFFICIENT JURY INSTRUCTIONS CONTRARY TO OHIO LAW AND THE STATE AND FEDERAL CONSTITUTIONS.

{¶22} "IV. THE JUDGMENT IS BASED ON INSUFFICIENT EVIDENCE AND IS OTHERWISE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE CONTRARY TO OHIO LAW AND THE STATE AND FEDERAL CONSTITUTIONS.

{¶23} 'V. THE DEFENDANT-APPELLANT WAS DENIED DUE PROCESS BY A SENTENCE CONTRARY TO OHIO LAW AND THE STATE AND FEDERAL CONSTITUTIONS."

I

{¶24} In his first assignment of error, appellant argues that the court erred in failing to suppress statements he made to police on July 18, 2010, July 20, 2010, and July 26, 2010. As to the July 18 statement, he argues that he indicated that he was done talking but police continued to question him, and he made incriminating statements concerning the location of his gun. As to the July 20 and July 26 statements, he argues that he had asserted his right to counsel at his initial court appearance on July 20. He argues that his first statement was taken in violation of the Fifth Amendment, while his second two statements were taken in violation of his Sixth Amendment right to counsel.

{¶25} On July 18, 2010, police interviewed appellant. At one point in the questioning, appellant said, "I don't know what's going on, I don't know nothing.'" The officer asked, "You done talking?" Appellant replied, "Yeah." Police then asked appellant if he had a gun. He responded that his "girl" had it, and gave them Savanna Cooper's telephone number.

{¶26} Appellant does not argue that he did not validly waive his Miranda rights prior to the start of the interview. Following a waiver of the right to remain silent, an assertion of the right to remain silent must be unambiguous to require the police to end the interrogation. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010). The United States Supreme Court noted that Thompkins did not state that he wished to remain

silent or that he did not wish to talk to police, either of which would have been an unambiguous exertion of his right to remain silent. Id.

{¶27} The Ohio Supreme Court has also held that an exertion of the right to remain silent must be unequivocal:

{¶28} "Although a suspect "need not 'speak with the discrimination of an Oxford don,'" *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371, quoting *id.* at 476, 114 S.Ct. at 2364, 129 L.Ed.2d at 382 (Souter, J., concurring in judgment), a suspect "must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an invocation of the right to remain silent." *State v. Ross* (1996), 203 Wis.2d 66, 78, 552 N.W.2d 428, 433, quoting *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371; see, also, *United States v. Mikell* (C.A.11, 1996), 102 F.3d 470, 476. If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity. See *Ross,* 203 Wis.2d at 75–76, 552 N.W.2d at 432, and fn. 4 (citing cases); *State v. Owen* (Fla.1997), 696 So.2d 715, 717–718; *State v. King* (Me.1998), 708 A.2d 1014, 1017. Thus, appellant's claim turns on whether his statement was an unambiguous invocation of his right to stop talking." *State v. Murphy*, 91 Ohio St. 3d 516, 520, 747 N.E.2d 765, 2001-Ohio-112.

{¶29} In *Murphy*, the court held that the defendant's statement, "I'm ready to quit talking now and I'm ready to go home, too," was not an unambiguous invocation of his right to remain silent. *Id.*

{¶30} In the instant case, appellant did not unambiguously invoke his right to remain silent. He initially expressed confusion about what the officers were discussing, indicating that he didn't know anything. He only stated that he was "done talking" in response to the officer's question. The officer asked if he was done talking in response to appellant's claims that he knew nothing, and appellant responded, "yeah." The record does not reflect an unambiguous assertion of his right to remain silence.

{¶31} Even if questioning should have stopped at that point, the gun would still be admissible as it was obtained from an independent source. The exclusionary rule does not apply if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint, as where the police have an independent source for discovery of the evidence. *State v. Carter,* 69 Ohio St.3d 57, 67, 630 N.E.2d 555, 1994-Ohio-343, citing *Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

{¶32} The evidence presented at the suppression hearing demonstrated that police obtained the gun independently of their tip from appellant. At the same time appellant was being interviewed by police, other officers went to the residence appellant shared with Savanna Cooper. They had no contact with the officers interviewing appellant, and obtained no information from them concerning a gun. When officers asked Savanna if appellant owned a firearm, she responded that he did, and it was at her dad's house. Savanna's dad arrived and took police to retrieve the gun. Therefore, police discovered the gun from an independent source.

{¶33} Appellant next argues that police should not have questioned him on July 20 and July 26 because he had asserted his right to counsel at his initial court

appearance on July 20. Appellant does not argue that he did not validly waive his Miranda rights at either interview, and in fact stated at the suppression hearing that the waivers were not the issue, and his challenge was solely to the improper nature of the interrogation after he requested appointed counsel at his initial court appearance earlier on July 20.

{¶34} At his initial appearance, when advised that he had the right to an appointed attorney if he could not afford one and that he had a right to a preliminary hearing, appellant asked to have an attorney appointed and asked for a preliminary hearing. Supp. Tr. 41-42. The court then explained the procedure for filling out the paperwork to have counsel appointed.

{¶35} The United States Supreme Court expressly rejected appellant's argument in *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176 (1990). In *Harvey*, the defendant had not merely expressed a desire to have counsel appointed, but had in fact obtained counsel. The United States Supreme Court held that nothing in the Sixth Amendment prevents a suspect represented by counsel from voluntary choosing to speak with police in the absence of an attorney. "Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be 'to imprison a man in his privileges and call it the Constitution.'" Id. at 1182.

{¶36} Appellant therefore could validly waive his right to counsel for questioning by police following a request for court-appointed counsel at an earlier court appearance. The record reflects that on July 20, 2010 and July 26, 2010, appellant was read his

Miranda rights and waived them, and appellant does not challenge the validity of these waivers. Accordingly, the court did not err in failing to suppress the statements made by appellant on July 20 and July 26, 2010.

{¶37} The first assignment of error is overruled.

II

{¶38} In his second assignment of error, appellant argues that the court erred in admitting Heather Knowlin's testimony, as her testimony was barred by the spousal privilege. In criminal cases, spousal privilege is governed by R.C. 2945.42, which provides in pertinent part:

{¶39} "Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness, or in case of personal injury by either the husband or wife to the other, or rape or the former offense of felonious sexual penetration in a case in which the offense can be committed against a spouse, or bigamy, or failure to provide for, or neglect or cruelty of either to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age, violation of a protection order or consent agreement, or neglect or abandonment of a spouse under a provision of those sections. The presence or whereabouts of the husband or wife is not an act under this section. The rule is the same if the marital relation has ceased to exist."

{¶40} The Sixth District recently summarized the law concerning the spousal privilege in *State v. Greaves*, 6th Dist. No. H-11-012, 2012-Ohio-1989, ¶17-19:

{¶41} "The general thrust of judicial policy is to construe statutory privileges narrowly: '[T]hey impede the search for truth and contravene the principle that the public has a right to everyone's evidence.' *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 121; *State v. Bryant,* 56 Ohio App.3d 20, 22, 564 N.E.2d 709 (6th Dist. 1988). As we have previously observed:

{¶42} "'Assertion of [an evidentiary] privilege serves to remove from the trier of fact otherwise relevant, reliable and competent evidence. Because the privilege operates to the detriment of the truth-seeking process, it has been viewed as a pernicious anomaly in our system of evidence. * * * [T]he privilege has come to mean little but the suppression of useful truth[.]' (Internal citations omitted.) *State v. Dress,* 10 Ohio App.3d 258, 261, 461 N.E.2d 1312 (6th Dist. 1982), *overruled on other grounds, State v. Smorgala,* 50 Ohio St.3d 222, 553 N.E.2d 672 (1990).

{¶43} "The right to invoke the spousal privilege, where it exists, belongs to the nontestifying spouse. *Perez* at ¶ 112. To be privileged, however, the communication at issue must be 'confidential.' *State v. Rahman,* 23 Ohio St.3d 146, 149, 492 N.E.2d 401 (1986). In assessing whether a communication was confidential, courts look to the language used, the nature of the message, the circumstances under which it was delivered, and other relevant facts. *Bryant, supra,* at 22, 564 N.E.2d 709; *Portsmouth v. Wrage,* 4th Dist. No. 08CA3237, 2009-Ohio-3390, 2009 WL 2003386, ¶ 21; *State v. Jackson,* 12th Dist. No. CA2011–01–001, 2011-Ohio-5593, 2011 WL 5146038, ¶ 30.

{¶44} "Verbal threats and violent acts between spouses are not marital 'confidences' which the privilege was intended to shield from courtroom disclosure. The ostensible purpose of the privilege, in protecting intimate exchanges, is to promote

'marital peace and harmony.' *Mowery* at 198, 438 N.E.2d 897. But as Ohio courts have long recognized, that purpose is wholly lost where one spouse has threatened or physically assaulted the other. *See Bryant* at 21–22, 564 N.E.2d 709 and *Wrage* at ¶ 21, both citing *State v. Antill,* 176 Ohio St. 61, 64, 197 N.E.2d 548 (1964). Such threatening or turbulent behavior is incompatible with the traditional premise of inter-spousal harmony out of which the confidences of marriage are imagined to flow. *Antill* at 64, 197 N.E.2d 548; *see also Mowery* at 198–199, 438 N.E.2d 897."

**{¶45}** In order for the spouse to claim privilege, the communication must not only have been made during the marriage, but the spouses must be living as husband and wife. *Bentleyville v. Pisani* (1995), 100 Ohio App.3d 515, 654 N.E.2d 394. "Where evidence shows that incidents of coverture have been relinquished, no legitimate purpose would be served by the exclusion of spousal testimony." *Id.* at 518, 654 N.E.2d at 396.

**{¶46}** Further, the Ohio Supreme Court has recognized that when one spouse is willing to testify against the other in a criminal proceeding, there is probably little in the way of marital harmony for the privilege to preserve, and a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace. *State v. Mowery*, 1 Ohio St.3d 192, 198, 438 N.E.2d 897 (1982), quoting *Trammel v. United States*, 445 U.S. 40, 100 S.Ct.906 (1980).

**{¶47}** In the instant case, the evidence reflects that although the parties were married and had a child together in March of 2010, they were not living in coverture as contemplated by R.C. 2945.42. Heather testified that they got married on August 25, 2009, so appellant could adopt Markia. Alysia Harris testified that appellant and

Heather never lived together, were not around each other much, and they mostly talked on the phone and texted each other. Mindi Mayle, appellant's father's girlfriend, testified that appellant stayed with her one or two nights a week, and when he wasn't living with her, he lived in Columbus with Savanna Cooper. Savanna Cooper testified that she began dating appellant on July 16, 2004, they began living together in October of 2006, and moved to a new residence together in November, 2009. Savanna knew about Markia and appellant brought her to Columbus with him from time to time, but she was unaware that appellant had married Heather until July of 2010. Because the parties were not living in coverture and there was no purpose in promoting spousal harmony between the parties, the court did not err in admitting Heather's testimony.

**{¶48}** Further, the court was careful to limit Heather's testimony concerning communications made by appellant to those made in front of a third person competent to be a witness, generally Alysia, who was present throughout the day in question. While no one was present when appellant put a gun to Heather's head and confessed to killing Tyler, and no one was present when they disposed of the body at the Tipton property together except Markia who was incompetent to be a witness, the purpose of the privilege in promoting spousal harmony was wholly lost because appellant pointed a gun at Heather and threatened to kill her.

**{¶49}** In addition, the Ohio Supreme Court has held that if the accused committed the acts in the known presence of a third person, he may not assert the spousal privilege even if that third person is unavailable to testify and was the victim of the accused's murder charge. *State v. Adamson,* 72 Ohio St.3d 431, 433-434, 650 N.E.2d 875, 1995-Ohio-199. Therefore, because appellant committed the shooting in

Tyler's presence, even though Tyler is unavailable to testify, he cannot assert the spousal privilege to prevent Heather from testifying about the shooting.

{¶50} The second assignment of error is overruled.

III

{¶51} In his third assignment of error, appellant argues that the court erred in failing to instruct the jury on accomplice testimony, specifically the testimony of Heather Nowlin, as required by R.C. 2923.03(D):

{¶52} "(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶53} "'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶54} "'It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

{¶55} Appellant did not object to the court's failure to give this instruction, nor did he request this instruction. Pursuant to Crim. R. 30(A), a party may not assign as error on appeal the failure to give an instruction unless the party objects before the jury retires to consider its verdict. Because appellant failed to object, we must find plain error in order to reverse. In order to prevail under a plain error analysis, appellant bears

the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978); Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶56} To determine whether a trial court's failure to give the accomplice instruction constitutes plain error, Ohio courts look to three factors: (1) whether other evidence at trial corroborated the alleged accomplice's testimony; (2) whether the jury was aware from the alleged accomplice's testimony that he benefited from agreeing to testify against the defendant; and/or (3) whether the court instructed the jury generally regarding its duty to evaluate the credibility of the witnesses and its province to determine what testimony is worthy of belief. *State v. Jennings*, 10th Dist. Nos. 09AP-70, 09AP-75, 2009-Ohio-6840, ¶67, citing *State v. Woodson,* 10th Dist. No. 03AP-736, 2004-Ohio-5713, ¶ 18.

{¶57} Heather's testimony was corroborated by other evidence. Alysia Harris testified that about a month before Tyler's death, Heather called and asked for a gun because appellant needed one. She testified that before Tyler's death, appellant asked her and her boyfriend at the time to lure Tyler out of his house so appellant could beat him up. She corroborated Heather's testimony about meeting appellant in a driveway before they took Tyler to the Tipton farm, and she heard appellant say, "Can you get him to the spot?" Tr. 267. She was in the car when they took Tyler to the Tipton farm, saw appellant grab a shovel from the trunk of the car, toss it aside, and tackle Tyler as he tried to run away. Karol Peairs, who was picking green beans  at a property

neighboring Paul Tipton's property, described a car matching the description of appellant's car on the Tipton property on July 10, and identified appellant in court as one of two men she saw sitting on a picnic table on the property that day. She further testified that as she was picking green beans, she heard two or three gunshots. Troy Peairs, who was picking green beans with his mother Karol, saw appellant on the Tipton property on July 10, 2010. Paul Tipton testified that he found a shovel on his property and that appellant had previously conducted target practice on the property using a small caliber handgun. Police found the body where Heather told them they would find the body, and the body had two gunshot wounds as described by Heather: one in the face and one in the back. Further, forensic evidence demonstrated that spent shell casings and bullets recovered from the crime scene were fired by appellant's gun.

{¶58} The jury was made aware at the beginning of Heather's testimony that she pleaded guilty to conspiracy to aggravated murder, kidnapping and tampering with evidence in exchange for a recommended sentence of 25 years and her agreement to cooperate in the prosecution of appellant and to testify against him in court. Further, the trial court instructed the jury regarding its duty to evaluate the credibility of witnesses. Tr. 921-922.

{¶59} The court's failure to instruct the jury concerning accomplice testimony was not plain error in the instant case. The third assignment of error is overruled.

IV

{¶60} In his fourth assignment of error, appellant argues that if the court erred in admitting the testimony of Heather Nowlin as discussed in his second assignment of error, the judgment of conviction is against the manifest weight and sufficiency of the

evidence.  As we have found in the second assignment of error, that the trial court did not err in admitting her testimony, this assignment of error is without merit.  Appellant makes no argument that if Heather's testimony was properly admitted, the evidence did not support conviction.

{¶61}  The fourth assignment of error is overruled.

V

{¶62}  In his final assignment of error, appellant argues that the court erred in sentencing him consecutively, as consecutive sentences are barred pursuant to R.C. 2929.41(A).

{¶63}  Appellant was sentenced on January 30, 2012, pursuant to the newly enacted House Bill 86.  2011 Am. Sub. H.B. No. 86, which became effective on September 30, 2011, revived the language provided in former R.C. 2929.14(E) and moved it to R.C. 2929.14(C)(4). The revisions to the felony sentencing statutes under 2011 Am. Sub. H.B. No. 86 now require a trial court to make specific findings when imposing consecutive sentences. R.C. 2929.14(C)(4) provides, in relevant part:

{¶64}  (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender **and** that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, **and** if the court also finds any of the following:

{¶65}  "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to

section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

**{¶66}** "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

**{¶67}** "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." (Emphasis added).

**{¶68}** In Section 11, the legislature explained that in amending former R.C. 2929.14(E)(4), it intended "to simultaneously repeal and revive the amended language in those divisions that was invalidated and severed by the Ohio Supreme Court's decision in *State v. Foster* (2006), 109 Ohio St.3d 1." The General Assembly further explained that the amended language in those divisions "is subject to reenactment under the United States Supreme Court's decision in *Oregon v. Ice* (2009), 555 U.S. 160, and the Ohio Supreme Court's decision in *State v. Hodge* (2010), Ohio St.3d , Slip Opinion No. 2010-Ohio-6320." Thus, it is the legislature's intent that courts interpret the language in R.C. 2929.14(C)(4) in the same manner as the courts did prior to *State v. Foster,* 109 Ohio St.3d 1, 2006–Ohio–856, 845 N.E.2d 470.

**{¶69}** The First District Court of Appeals has observed, the consecutive-sentence findings required by R.C. 2929.14(C) are not the same as those required by former R.C. 2929.19(B)(2), which provided that the trial court "shall impose a sentence

and shall make a finding that *gives its reasons* for selecting the sentence * * * (c) If it imposes consecutive sentences ." (Emphasis added.) *See State v. Comer,* 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, ¶ 14–16. In 2003, the Ohio Supreme Court held that the requirement that a trial court give its reasons for selecting consecutive sentences was "separate and distinct from the duty to make the findings," and it imposed an obligation on trial courts to articulate the reasons supporting their findings at the sentencing hearing. *Id.* at ¶ 19–20, 793 N.E.2d 473. The trial court's obligation to "give its reasons" is now gone from the sentencing statutes. Gone with it, we hold, is the requirement that the trial court articulate and justify its findings at the sentencing hearing. A trial court is free to do so, of course. But where, as here, there is no statutory requirement that the trial court articulate its reasons, it does not commit reversible error if it fails to do so, as long as it has made the required findings. *See Phillips,* 1st Dist. No. C–960898, 1997 Ohio App. LEXIS 2615, 1997 WL 330605. *State v. Alexander*, 1st Dist. Nos. C-110828, C-110829, 2012-Ohio-3349, ¶ 18. *Accord, State v. Frasca,* 11th Dist. 2011-T-0108, 2012-Ohio-3746, ¶ 57.

{¶70} The trial court is not required to recite any "magic" or "talismanic" words when imposing consecutive sentences provided it is "clear from the record that the trial court engaged in the appropriate analysis." *State v. Murrin,* 8th Dist. No. 83714, 2004-Ohio-3962, ¶ 12. *Accord*, *State v. Jones*, 1st Dist. No. C-110603, 2012-Ohio-2075, ¶ 22; An appellate court may only sustain an assignment of error challenging the imposition of consecutive sentences under R.C. 2929.14 if the appellant shows that the judgment was clearly and convincingly contrary to law. R.C. 2953.08(G).

{¶71} Contra to appellant's argument, the trial court could impose consecutive sentences in the instant case upon the making of the findings required by R.C. 2929.14(C)(4). However, a review of the judgment of sentence and the sentencing transcript reveals that the trial court did not make the required findings to impose consecutive sentences. The fifth assignment of error is sustained.

{¶72} The judgment of the Muskingum County Common Pleas Court is reversed solely as to the imposition of consecutive sentences. In all other respects, the judgment is affirmed. This cause is remanded to that court for resentencing.

By: Edwards, J.

Gwin, P.J. concurs and

Hoffman, J. concurs separately

_____

_____

_____

                              JUDGES

JAE/r0821

*Hoffman, J., concurring*

{¶73} I concur in the majority's analysis and disposition of Appellant's Assignments of Error I, II, III and IV.

{¶74} I further concur in the majority's disposition of Appellant's Assignment of Error V. I write separately only to state my disagreement with the majority's conclusion the trial court is not required to recite any "magic" or "talismanic" words when imposing consecutive sentences, provided it is "clear from the record that the trial court engaged in the appropriate analysis."[1]

{¶75} While I personally find such approach both reasonable and practicable, I do not believe it satisfies the duty to make the statutorily enumerated "findings" as recognized and required in *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165.

_____
HON. WILLIAM B. HOFFMAN

_____

[1] Majority opinion at paragraph 70.

[Cite as *State v. Nowlin*, 2012-Ohio-4923.]

IN THE COURT OF APPEALS FOR MUSKINGUM COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| TERRELL M. NOWLIN | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. CT2012-0015 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Common Pleas Court is reversed solely as to the imposition of consecutive sentences. In all other respects, the judgment is affirmed. This cause is remanded to that court for resentencing. Costs assessed to appellant.

_____

_____

_____

JUDGES