[Cite as *State v. Ball*, 2013-Ohio-3506.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    26537 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ROGER H. BALL | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 11 04 0942 |

DECISION AND JOURNAL ENTRY

Dated: August 14, 2013

BELFANCE, Judge.

{¶1}    Defendant-Appellant Roger Ball appeals from his convictions in the Summit County Court of Common Pleas.  For the reasons set forth below, we affirm.

I.

{¶2}    Mr. Ball was a foster parent in Summit County and generally had between three and six school-age boys in his care at any given time.  On June 23, 2010, one of Mr. Ball's foster children, J.W., born August 18, 1999, presented a Summit County Children Services' supervisor with a letter alleging that Mr. Ball had inappropriately touched J.W.  Subsequently, four other boys, C.H., born July 28, 1998, C.D., born January 3, 2000, F.B., born March 15, 2001, and R.W., born August 27, 2002, alleged that Mr. Ball had sexually assaulted them as well.

{¶3}    As a result of the allegations, Mr. Ball was indicted for one count of rape, one count of gross sexual imposition, and one count of sexual battery involving C.H., one count of gross sexual imposition involving C.D., one count of gross sexual imposition involving J.W., and

two counts of gross sexual imposition involving F.B. A supplemental indictment was filed alleging one count of gross sexual imposition involving R.W. Subsequently, the State dismissed as duplicative one of the gross sexual imposition counts involving F.B. and the counts were renumbered. The matter proceeded to a jury trial. The jury found Mr. Ball guilty of all seven counts. The trial court merged the rape and sexual battery charges for purposes of sentencing and Mr. Ball was sentenced to an aggregate term of 35 years to life in prison. Mr. Ball has appealed, raising three assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT'S JUDGMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE * * * AND IS NOT SUPPORTED BY THE EVIDENCE.

{¶4} While Mr. Ball frames his argument in terms of challenges to both the sufficiency and weight of the evidence, Mr. Ball only challenges the evidence based upon the credibility of the witnesses and conflicts in the testimony. Accordingly, his argument is actually limited to a challenge to the weight of the evidence. *See State v. Hill,* 9th Dist. Lorain No. 09CA009709, 2011-Ohio-1154, ¶ 10.

{¶5} In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶6} Mr. Ball was found guilty of one count of rape in violation of R.C. 2907.02(A)(1)(b), one count of sexual battery in violation of R.C. 2907.03(A)(5), and five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4).

{¶7} R.C. 2907.02(A)(1)(b) states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.03(A)(5) provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."

> "Sexual conduct" means * * * anal intercourse[ or] fellatio[] * * * between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into * * * anal opening of another. Penetration, however slight, is sufficient to complete * * * anal intercourse.

R.C. 2907.01(A). R.C. 2907.05(A)(4) states that "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶8} Both sides presented substantial evidence in support of their competing positions. Moreover, while much of the boys' account of events contained similar information, the accounts varied between boys. Further, with respect to some of the boys, the accounts of the same boy varied somewhat each time the boy was questioned. Thus, the jury was faced with the task of carefully evaluating the testimony of over a dozen witnesses and determining the

witnesses' credibility. After a thorough, independent review of the entire record, we cannot say that the jury lost its way in finding Mr. Ball guilty of the charges at issue.

{¶9} As noted above, prior to June 23, 2010, Mr. Ball was a foster parent to several school-age boys; typically, between three and six boys stayed at Mr. Ball's home at any given time. The boys referred to Mr. Ball as either "Poppy" or "Pappy." No other adults lived in Mr. Ball's home during the relevant periods. R.W. stayed in Mr. Ball's home from January 29, 2007, until November 7, 2008, when he was between 4 and 6 years of age. F.B. was placed with Mr. Ball from November 8, 2008, until February 20, 2009, when he was 7 years old. C.D. lived in Mr. Ball's home from January 30, 2009 until June 23, 2010, when he was between 9 and 10 years old. C.H. was placed with Mr. Ball from January 5, 2009, until June 23, 2010, when he was between 10 and 11 years old. J.W. stayed with Mr. Ball from February 2, 2010, until June 23, 2010, when he was 10 years old. Thus, F.B. was briefly in Mr. Ball's home at the same time as C.D., C.H., and J.W., and C.D., C.H., and J.W. spent a majority of their placement with Mr. Ball together. Only R.W. was never in Mr. Ball's house at the same time as the other boys. Both F.B. and R.W. were no longer in Mr. Ball's care when the allegations concerning Mr. Ball began to surface. None of the boys involved were related.

{¶10} The allegations against Mr. Ball began to come to light on June 23, 2010, when J.W., his two brothers, C.H., C.D., and another boy, J.G. were driven by Mr. Ball to a scheduled visitation between J.W. and his brothers and their mother. During the visitation, J.W. told his mother that he had a note to give his caseworker, who was not present at the time. Instead, J.W.'s mother found the caseworker's supervisor and J.W. gave the note to the caseworker's supervisor. The note stated that "Poppy was feeling on my butt and get[t]ing on top of me and I don't like that." The caseworker's supervisor reported the information to the child abuse

reporting number, and all the boys in Mr. Ball's care were removed from his home. Two days later, during a visitation with his mom, C.H. also reported that he had been sexually abused. Both J.W. and C.H. were interviewed by a social worked at the Akron Children's Hospital's CARE Center and also underwent a medical evaluation in July 2010.

{¶11}  F.B.'s parents found out about the investigation and contacted police and asked the police to speak with F.B.  F.B. was interviewed in January 2011 and made similar allegations.  At that point in time, police began to contact other families with children that had been placed with Mr. Ball to see if any more children had been abused.  C.D. initially denied any abuse by Mr. Ball but after being interviewed by police alleged that Mr. Ball inappropriately touched him as well.  Children Services came to R.W.'s home after R.W. reported to someone at his school that he was concerned about an argument his mother had with her boyfriend.  While talking with someone from Children Services, R.W. revealed that Mr. Ball had also abused him.  R.W. was also interviewed at the CARE Center.

{¶12}  At trial, all five boys testified, and the CARE Center interviews of J.W., C.H., and R.W. were played for the jury and admitted as exhibits.  J.W. testified that, when he was living with Mr. Ball, he shared a room with C.H.  He indicated that his two brothers were also living at Mr. Ball's during the same time period.  J.W. testified that the boys' bedrooms were on the second floor and Mr. Ball's bedroom was in the attic.  Additionally, J.W. stated that were several video game systems in the basement for the boys to play.  J.W. indicated that at night sometimes Mr. Ball would bring J.W. up to the attic and "touch [him] and feel on [him]."  J.W. stated at trial that Mr. Ball would touch his "wiener and butt[]" underneath his underwear; however, in the CARE Center interview, J.W. only revealed that Mr. Ball had touched his buttocks.  J.W. estimated at trial that Mr. Ball touched him five times a week, although in the CARE Center

interview J.W. indicated that it happened only four or five times. J.W. stated that initially he did not tell anyone because he was scared that no one would believe him. Ultimately, however, J.W. did tell one of the other boys, J.G., that Mr. Ball was touching him. J.W. wrote a letter, detailing in part the abuse, which led to the investigation that resulted in the charges against Mr. Ball.

{¶13} J.G. lived with Mr. Ball on two occasions, for a total of approximately five years. J.G. was with the other boys in the van on the day that J.W. presented the supervisor with the letter. Prior to leaving for J.W.'s visitation, J.W. was very upset and told J.G. that he did not like living there and did not like washing clothes. J.W. asked J.G. if he would fill out a paper saying that Mr. Ball touched J.W. inappropriately. J.G. stated that he could not do that because he did not see it happen, but if it did happen he should tell his mother. After J.W. and his brothers went in the building for visitation, Mr. Ball came back and told the boys that there would be some people that wanted to ask them questions and that they should tell the truth and told them that they did not have to lie. He indicated that that day he was interviewed and he reported that Mr. Ball never touched him and testified at trial to the same. In addition, he testified that he never saw Mr. Ball touch any of the boys inappropriately.

{¶14} C.H. was ten to eleven years old when he lived with Mr. Ball. C.H. was described as having special needs including a seizure disorder and attention deficit. In addition, C.H. had behavioral problems, had difficulties in school, demonstrated self-injurious behavior, and had problems with stealing and lying. In fact, C.H. was being seen by a psychologist, Dr. Penny Griffith, beginning in 2005 due to his behavioral issues. C.H. was fearful of his mother's boyfriend and had anxiety related to a prior domestic violence incident. These problems were all present prior to C.H. being placed with Mr. Ball. Dr. Griffith saw C.H. for 91 sessions, approximately a third of which occurred prior to C.H.'s placement with Mr. Ball. At trial, Dr.

Griffith testified that she almost never felt that C.H. was truthful. Twenty-four of the 91 sessions involved discussions about C.H. lying.

{¶15} C.H. shared a room with J.W. when the boys lived with Mr. Ball. C.H. testified that Mr. Ball would wake him up at night and tell him to go up to the attic where Mr. Ball would touch C.H.'s penis and buttocks. C.H. testified that this happened on more than one occasion. He testified that Mr. Ball would touch C.H.'s penis with his hand and would also lick it. In addition, C.H. testified that Mr. Ball "put his [penis] into [C.H.'s] behind[]" and that Mr. Ball had C.H. touch Mr. Ball's private parts. Mr. Ball told C.H. not to tell anyone what happened because he would "lose everything." C.H. testified that he got an STD and had to have three surgeries to remove warts from his body.

{¶16} When interviewed on June 23, 2010, C.H. initially denied that he was abused by Mr. Ball. On June 25, 2010, C.H.'s caseworker was meeting with C.H. to evaluate how things were going in the temporary foster situation. C.H. stated that he could not believe that J.W. put him in that situation and that J.W. lied about Mr. Ball. When they stopped at C.H.'s mother's house, C.H.'s mother told C.H. to tell the caseworker what happened. C.H. stated that Mr. Ball stuck his finger in C.H.'s buttocks and tried to put his "thing" in C.H.'s buttocks. C.H. was subsequently interviewed by a social worker at the CARE Center.

{¶17} During the CARE Center interview, C.H. reported similar allegations in that he told the social worker that Mr. Ball had touched his penis and his buttocks and that Mr. Ball had stuck his penis up C.H.'s buttocks. However, C.H. indicated during the CARE Center interview that the abuse only happened twice and that it happened at night, but described night as 6 a.m.; whereas at trial he testified it happened on multiple occasions and always at night. Moreover, in the CARE Center interview, C.H. stated that Mr. Ball would "jack[] off" with C.H.'s penis,

allegations that were not repeated at trial. During the interview, C.H. admitted to not knowing what "jack off" meant.

{¶18} C.H. first told Dr. Griffith about Mr. Ball's abuse on June 28, 2010. He told Dr. Griffith that Mr. Ball molested him in January 2009, that it happened at 6 a.m., that Mr. Ball tried to put "his thing in his butt hole[,]" and that "Mr. Ball would ejaculate on his forehead, and that it looked like "pee[.]"

{¶19} Donna Abbott, a nurse practitioner with the CARE Center who performed a medical examination on J.W., C.H., and R.W. and indicated that all of the boys had normal exams at the time. She testified that such was not inconsistent with the boys' allegations, including C.H.'s. She indicated that C.H. could have been anally penetrated and not have had any abnormal findings upon examination. Ms. Abbott also stated that the tests performed on C.H. in July 2010 at the CARE Center came back negative for sexually transmitted diseases.

{¶20} Around September 2011, C.H. developed lumps around his anus which became itchy and began to bleed. He sought treatment for the condition. The warty lesions were limited to the perianal area and required more than one surgery to remove. Dr. Richard Daryl Steiner, M.D., the Medical Director of the CARE Center was asked to review subsequent treatment records of C.H. Dr. Steiner testified that C.H.'s condition, known as condylomata acuminata, was caused by human papilloma virus (HPV) and is sexually transmitted. Dr. Steiner indicated that the HPV virus can be transmitted via anal intercourse. He further testified that HPV has a prolonged and variable incubation period, which can be anywhere from several weeks to a year and a half, meaning that it can take up to a year and a half from the sexual contact for symptoms of the virus to appear. Dr. Steiner testified that, assuming C.H. was subjected to anal intercourse prior to June 23, 2010, it would be possible that he would not develop anal warts until September

2011. Dr. Steiner indicated that after a period of time, sometimes as long as years, the human body will clear the HPV virus.

{¶21} Dr. Steiner also reviewed Mr. Ball's HPV test results, which were negative for HPV. Dr. Steiner stated that the doctor that performed the test

> [p]erformed a DNA swab of the anal\rectal region [of Mr. Ball] for HPV. * * * [N]o HPV DNA was obtained. * * * [However,] the specimen was taken from the wrong location. The specimen was taken from the anal\rectal region of Roger Ball. * * * [C.H.] would have received his anal warts from contact with the assailant's penis, not with contact with the assailant's anus. So, this was the wrong specimen to take, and really is meaningless in an attempt to determine whether or not the patient, Roger Ball, had HPV of his penis.

{¶22} Additionally, Dr. Steiner noted that, given the long incubation period of C.H.'s HPV, it was possible that, assuming Mr. Ball gave C.H. HPV, Mr. Ball's infection would have cleared prior to the time he was tested. Dr. Steiner stated that an appropriate test of Mr. Ball would have involved swabbing Mr. Ball's urethra and that test was not performed.

{¶23} In December 2011, C.H. began to see a trauma specialist, Dr. Cynthia Keck-McNulty, Ph.D., after he had been diagnosed with HPV and anal warts. C.H. began to exhibit severe signs of agitation and anxiety and became largely nonverbal. During the first session, C.H. was very agitated and was not talking. C.H.'s mother related that C.H. was picking at his skin and causing harm to himself by doing so. At one point during the session, C.H. asked for a pen and drew a picture of man with an exaggerated penis standing next to a bed and C.H. lying on the bed. As Dr. Keck-McNulty was looking at the drawing, C.H. crawled under the sofa in the room, refused to come out, and began rocking. C.H. refused to verbalize during the first session. Dr. Keck-McNulty met with C.H. for approximately six sessions and over time C.H. was able to verbalize what Mr. Ball had done. C.H. told Dr. Keck-McNulty that Mr. Ball took showers with C.H. and touched him in the shower, that C.H. had witnessed Mr. Ball playing

Xbox in his robe and that Mr. Ball was naked under the robe, that he had witnessed Mr. Ball playing an Xbox game where "'You press A to hump and B to do it harder[,]'" and that Mr. Ball had touched C.H.'s buttocks and anally penetrated C.H. Dr. Keck-McNulty testified that it is typical for children to disclose abuse a little bit at time and to reveal more information over time. Dr. Keck-McNulty diagnosed C.H. as having an autistic disorder and PTSD. Dr. Keck-McNulty noted that C.H.'s drawings did not change nor did the statements about the abuse. She indicated that, at his age, he would be unable to make up the details of the sexual abuse unless he had somehow seen or experienced them.

{¶24} R.W. stayed with Mr. Ball when he was between four and six years old. He testified that initially he and his brother stayed with Mr. Ball in one house, and, a couple weeks into his placement, Mr. Ball moved into the house where all the allegations took place. R.W. lived in that house with his older brother and three other boys. Mr. Ball had his bedroom in the attic and would wake R.W. up in the middle of the night and take him to the attic. Mr. Ball would touch R.W.'s buttocks and penis underneath his underwear. R.W. estimated that it would happen twice a week. After Mr. Ball finished, he would tell R.W. to go downstairs and play video games. When R.W. and his brother left Mr. Ball's house and packed up their belongings to go live with their mother, R.W. found Mr. Ball's calendar along with his belongings. The calendar had boys' names on it, including R.W.'s name, and there was a different boy listed for each day of the week. At trial, R.W. testified he did not know what the calendar was for although he admitted that he had told his mom before that the calendar showed which boy was going to up to Mr. Ball's room that day. R.W. also stated during the CARE Center interview that the calendar indicated which boy would go up to the attic that day with Mr. Ball. R.W. testified that he threw out the calendar. Police were unable to locate it. Frequently in the CARE Center

interview and at least once during trial, R.W. would refer to inappropriate conduct happening to "us." During the CARE Center interview the social worker clarified with R.W. was relating conduct that happened to him. Ultimately, R.W. testified that he reported the allegations to his mother.

{¶25} C.D. was between nine and ten years old when he lived with Mr. Ball. At the time of trial, C.D. was still placed within the foster care system. While C.D. was placed with Mr. Ball, C.H., J.G., J.W., and J.W.'s brothers were also staying with Mr. Ball. C.D. shared a bedroom with J.G. Mr. Ball would take C.D. upstairs at night and touch his private parts, his "wiener" and his buttocks. This would happen on multiple occasions, usually multiple times a week. Mr. Ball also would try to get C.D. to touch Mr. Ball's "private part." Generally, C.D. refused but at one point he did touch Mr. Ball's private part. Mr. Ball told him not to tell anyone what was happening. C.D. accompanied Mr. Ball and the others on June 23, 2010, in the van when J.W. and his brothers went to visit their mother. At that time, C.D. indicated that J.G. said that J.W. was going to lie about Mr. Ball and get him in trouble. When Mr. Ball was interviewed by police in August 2010, he also indicated that he had heard a conversation in the van on June 23, 2010, in which someone stated that J.W. was going to lie about Mr. Ball. At trial, J.G. denied that J.W. told him that. When C.D. was first questioned on June 23, 2010, regarding J.W.'s allegations, C.D. indicated that Mr. Ball did not touch him. Later, however, when C.D. was interviewed by the police, C.D. reported that Mr. Ball had sexually abused him. C.D. indicated that he lied in June 2010 but told the truth to the police later.

{¶26} F.B. was seven when he lived with Mr. Ball. F.B. indicated that, when the boys first got to Mr. Ball's house, Mr. Ball would show them how to use the shower. F.B. told Mr. Ball that he already knew how to use the shower, but Mr. Ball insisted. F.B. testified that his

first time in the shower, in 2008, Mr. Ball touched F.B. inappropriately. F.B. reported the incident to Children Services, but nothing ever came of the allegations. Police corroborated that a report has been filed in December 2008 involving F.B. and alleged inappropriate touching by Mr. Ball.

{¶27} In addition, F.B. testified that at night, Mr. Ball would pick a boy to go with him to the attic and sometimes he would pick F.B. When F.B. was in the attic with Mr. Ball, most of the time it would just be him and Mr. Ball; however, one time Mr. Ball took F.B. and another boy, not otherwise involved with the case, up to the attic and touched them both. F.B. did not mention the incident with the other boy and Mr. Ball to the police when he spoke with them. Mr. Ball would touch F.B's penis and his buttocks and lay on top of him. F.B. testified that Mr. Ball would take him up to the attic every couple of weeks. F.B. also indicated that C.H.'s mom and his mom were friends and that he and C.H. were friends.

{¶28} Additionally, many of the boys' caseworkers testified and indicated that they spent time with each boy with Mr. Ball and alone. Each of the caseworkers visited the boys on a regular basis. None of the children reported any incidents to their caseworkers prior to June 23, 2010. Finally, Christine Hilton, a certified foster parent and retired social worker also testified on Mr. Ball's behalf. She had known Mr. Ball for about ten years. She stated that she would see Mr. Ball approximately weekly and would babysit for the boys and do housecleaning at Mr. Ball's home. Ms. Hilton never saw any inappropriate behavior between Mr. Ball and the boys and the boys never reported any inappropriate touching to her. Ms. Hilton noted that Mr. Ball was known for taking in boys that were unruly. Several people, including the boys, testified that Mr. Ball was strict and had a lot of rules, but all the boys except for one indicated that Mr. Ball never hit them. Generally the boys' punishment would involve writing essays. Mr. Ball also

provided the boys with an allowance and rewarded them for good behavior with video games and trips out to eat.

**{¶29}** Essentially, Mr. Ball's assertion is that the boys' testimony was not credible as they told differing stories, did not report the abuse right away, and sometimes changed their stories. Additionally, Mr. Ball points out that he presented a significant amount of testimony, much of which was aimed at discrediting the testimony of the boys. Mr. Ball also maintains that his witnesses were more credible. Overall, it seems Mr. Ball believes that the boys conspired against him and concocted the allegations because they were angry with Mr. Ball's strict rules and/or they wanted to return to their parents and thought making false accusations against him would assist in that process. Additionally, Mr. Ball appears to make the speculative assertion that the boys' mothers may have influenced the boys into making and/or compounding accusations against Mr. Ball.

**{¶30}** While the jury was certainly free to find the boys' testimony not credible, we cannot say that it lost its way in concluding that Mr. Ball committed the crimes for which he was charged. The jury was presented with a great deal of testimony, much of which was presented by the defense, including the testimony of J.G., who never witnessed or experienced any impropriety while living with Mr. Ball, as well as some of the boys' caseworkers, who, despite ongoing, private meetings with the boys, were not informed of any impropriety by Mr. Ball prior to June 23, 2010. Thus, the jury was charged with evaluating the credibility of the witnesses and resolving conflicts in the testimony. We cannot say that the jury's credibility determinations were unreasonable. *See State v. Andrews,* 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28.

**{¶31}** The social worker, Colleen Shrout, who interviewed J.W., C.H., and R.W. at the CARE Center indicated that it was common that children did not disclose everything that

happened in the first session and that is why they are referred to counseling. Similar statements were made by Dr. Keck-McNulty. Ms. Shrout also stated that, in her experience, boys tended to be less forthcoming during the initial interview than girls. Ms. Shrout testified that it was not uncommon for children not to remember the precise dates when the abuse happened.

{¶32} To the extent that Mr. Ball maintains that the boys conspired against him and were upset by his rules and/or wanted to return home, such could be a possibility. However, some of the boys were already home with their parents when the allegations developed, and at least one of the boys, R.W., appears to have no connection with the other boys and was not in Mr. Ball's home with any of the other boys. Additionally, we note there was testimony indicating that F.B. made allegations against Mr. Ball long before J.W. came forward with his allegations against Mr. Ball. While the defense presented evidence that Mr. Ball was perceived by others as a good foster parent, it was undisputed that no other adults were present at night in Mr. Ball's home when the abuse allegedly took place. In light of the entirety of the evidence, we cannot say that the jury lost its way in finding Mr. Ball guilty of the charges against him. Accordingly, we overrule Mr. Ball's first assignment of error.

## ASSIGNMENT OF ERROR II

THE APPELLANT'S CONVICTION MUST BE OVERTURNED IN THAT HE
WAS NOT PROVIDED WITH COMPETENT TRIAL COUNSEL.

{¶33} Mr. Ball asserts in his second assignment of error that he was denied effective assistance of counsel. Mr. Ball argues that his trial counsel was ineffective for telling the jury that Mr. Ball would testify when Mr. Ball did not end up testifying, for failing to object to C.H. testifying that he got an STD from Mr. Ball, for failing to object to testimony regarding the calendar, and for failing to subpoena the boys' mothers to testify. We do not agree.

**{¶34}** In order to prevail on an ineffective assistance of counsel claim, a defendant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). Mr. Ball bears the burden of proving that his trial counsel was ineffective. *State v. Perry,* 9th Dist. Summit No. 25271, 2011-Ohio-2242, ¶ 29.

**{¶35}** Mr. Ball first asserts trial counsel was ineffective by informing the jury that Mr. Ball would testify when ultimately Mr. Ball did not testify. Twice in opening statement, trial counsel indicated that Mr. Ball *or someone* else would testify to certain details. However, later in opening statement, trial counsel twice indicated without qualification that Mr. Ball himself would testify. Ultimately, Mr. Ball did not take the stand. However, the trial court did instruct the jury that opening statements are not evidence and that "[i]t [was] not necessary that [Mr. Ball] take the witness stand in own defense. He has a constitutional right not to testify. The fact that he did not testify must not be considered for any purpose."

**{¶36}** We observe that, it is difficult to know how, and to what extent, Mr. Ball's testimony would have impacted the jury's decision, given that we have no way of knowing what Mr. Ball would have testified to or whether the jury would have found him credible. Notwithstanding, we note that the references to Mr. Ball or someone else testifying were sporadic, and it is possible the jury would have viewed the entirety of the opening statement as indicating that *someone,* but not necessarily Mr. Ball, would testify to everything defense counsel discussed. This is particularly possible given that defense counsel did present six

witnesses on behalf of Mr. Ball. Even counsel's reference to Mr. Ball testifying was prefaced by a reference to Mr. Ball's statement given to the investigating detective.

{¶37} "[C]ounsel should be wary of representing that a defendant will waive h[is] Fifth Amendment right and testify, especially when whether []he will is then an open question, as it apparently was here. If a defendant elects to not testify, the representation may then burden a defendant's exercise of h[is] constitutional right." *State v. West,* 2d Dist. Montgomery No. 22966, 2009-Ohio-6270, ¶ 13. Nonetheless, there is nothing in the record which would allow us to infer that counsel's actions fell below the standard of reasonable representation. The record is silent with respect to why Mr. Ball did not testify. It is possible that Mr. Ball informed his counsel mid-way through trial that he did not want to testify; a choice that Mr. Ball was entitled to make and that would not reflect on the quality of counsel's performance. Further, we cannot say that Mr. Ball was prejudiced by trial counsel's opening statement in light of the instructions provided to the jury, which it is presumed to have followed, *id.* at ¶ 14, and the overall content of the opening statement. The focus of the opening statement was not at all upon what the jury could expect to hear directly from Mr. Ball nor did counsel emphasize that Mr. Ball would testify. Rather, the focus of counsel's opening statement was upon the troubled past of the children, the fact that some of the children reported that J.W was going to tell a lie about Mr. Ball, and that another child denied that he had ever seen anything improper, thus casting doubts upon the children's credibility. Under the circumstances of this case, and given the record before us, we cannot say that trial counsel's behavior prejudiced Mr. Ball.

{¶38} Mr. Ball contends that his trial counsel was also ineffective in failing to object to C.H.'s testimony that Mr. Ball gave C.H. a STD absent the introduction of medical testimony

and in failing to object to the testimony about the calendar R.W. found because there was no testimony about what the calendar represented.

{¶39} With respect to C.H.'s testimony, we note that there was medical testimony in the record via Dr. Steiner. Dr. Steiner testified that C.H.'s condition, known as condylomata acuminata, was caused by human papilloma virus (HPV) and, given his age, was sexually transmitted. Dr. Steiner indicated that the HPV virus can be transmitted via anal intercourse. He further testified that HPV has a prolonged and variable incubation period, and thus, assuming C.H. was subjected to anal intercourse prior to June 23, 2010, it would be possible that he would not develop anal warts until September 2011. Moreover, as noted above, Dr. Steiner explained why Mr. Ball's negative HPV test did not necessarily mean that Mr. Ball did not or never had HPV. While there was no definitive link between Mr. Ball and C.H.'s HPV, there was evidence besides C.H.'s testimony that C.H. had a sexually transmitted disease that could have been caused by Mr. Ball. Accordingly, we cannot say that trial counsel's failure to object to C.H.'s testimony about the STD prejudiced Mr. Ball.

{¶40} With respect to trial counsel's failure to object to R.W.'s testimony regarding the calendar when there was no testimony about the purpose of the calendar, we note that in R.W.'s CARE Center interview he indicated that the calendar listed what boy was supposed to go up to the attic with Mr. Ball on which day. Accordingly, there was evidence about what the calendar's purpose was. Moreover, trial counsel cross-examined R.W. about the calendar. Trial counsel's examination caused R.W. to admit that, while R.W. claimed at trial that he did not know what the calendar was for, he previously had told others that he knew what the calendar's purpose was. Such behavior could have been a trial tactic to emphasize to the jury that R.W. had changed his story and to detract from R.W.'s credibility. The fact that the tactic was not

successful does not mean that it was not a valid trial tactic. *See State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101 ("[D]ebatable trial tactics do not establish ineffective assistance of counsel."). Accordingly, we cannot say that trial counsel's failure to object amounted to ineffective assistance.

{¶41} Finally, with respect to Mr. Ball's assertion that trial counsel was ineffective for failing to call the boys' mothers as witnesses, we conclude that Mr. Ball cannot establish that Mr. Ball was prejudiced by this failure. There is nothing in the record to demonstrate what the boys' mothers would have testified to, nor is there anything to demonstrate that such testimony would have aided Mr. Ball's defense. *See State v. Treesh,* 90 Ohio St.3d 460, 490 (2001). Moreover, generally speaking, the decision to call, or not call, witnesses falls within the purview of trial strategy. *Id.* In light of the foregoing, we overrule Mr. Ball's second assignment of error.

## ASSIGNMENT OF ERROR III

THE DEFENDANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

{¶42} Mr. Ball asserts in his third assignment of error that he was denied a fair trial due to prosecutorial misconduct. We do not agree.

{¶43} Mr. Ball maintains that the prosecution committed misconduct by (1) presenting evidence about the calendar R.W. claimed to have found; and (2) by allowing C.H. to testify about the STD he had because "the prosecutor had to have known that an 8th grader could not diagnose a sexually transmitted disease, and that [he] could not testify as to the cause and source of [the] same." Notably, Mr. Ball has not addressed the fact that Dr. Steiner presented independent testimony concerning C.H's diagnosis.

{¶44} Importantly, it does not appear that Mr. Ball objected to any of the alleged incidents of prosecutorial misconduct. Mr. Ball does not assert in his brief that he did object, nor

has he pointed this Court to any place in the record demonstrating that he did object. Thus, Mr. Ball has forfeited all but plain error. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, ¶ 45. However, because Mr. Ball has not argued plain error on appeal, we decline to address the merits of this argument. *See State v. Hoang,* 9th Dist. Medina No. 09CA0061-M, 2010-Ohio-6054, ¶ 21. Notwithstanding the foregoing, in light of our prior analysis of these issues in the context of ineffective assistance of counsel, we fail to see how Mr. Ball has demonstrated plain error or that he was denied a fair trial. *See State v. Jones,* 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 200. Mr. Ball's third assignment of error is overruled.

### III.

**{¶45}** In light of the foregoing, we overrule Mr. Ball's assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                               _____

                               EVE V. BELFANCE
                               FOR THE COURT

MOORE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

THOMAS C. LOEPP, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.