[Cite as *State v. Renaud*, 2017-Ohio-8218.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | C.A. No.      28439 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| PATRICK RENAUD | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.      CR-2016-01-0212 |

DECISION AND JOURNAL ENTRY

Dated: October 18, 2017

CARR, Judge.

{¶1}     Defendant-Appellant Patrick Renaud appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}     In January 2016, Renaud was indicted on two counts of rape in violation of R.C. 2907.02(A)(1)(b), two counts of sexual battery in violation of R.C. 2907.03(A)(5), and five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4).  The charges alleged that Renaud had sexually abused his stepdaughter, A.T. (D.O.B. December 7, 2000).

{¶3}     The matter proceeded to a jury trial.  During trial, the dates referenced in the indictment were amended from May 1, 2013 through September 30, 2013 to March 15, 2013 through December 6, 2013.  The jury found Renaud guilty of all counts.  At sentencing, the trial court found that the counts for sexual battery merged with the rape counts.  The State elected to sentence Renaud on the rape counts.  Renaud was sentenced to an indefinite term of life

imprisonment on each of the two rape counts and to a term of five years on each of the gross sexual imposition counts. The trial court ordered the sentences to be served consecutively.

{¶4} Renaud has appealed, raising three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE CONVICTIONS AND, AS A RESULT, APPELLANT RENAUD'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED[.]

{¶5} Renaud argues in his first assignment of error that the evidence was insufficient to support his convictions. Specifically, he maintains that the evidence was insufficient because there was no physical evidence to support the allegations and there were conflicting statements as to when and where the conduct occurred. Additionally, he argues there was insufficient evidence that A.T. was less than 13 years of age at the time of the abuse.

{¶6} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶7} Renaud was convicted of two counts of rape in violation of R.C. 2907.02(A)(1)(b), two counts of sexual battery in violation of R.C. 2907.03(A)(5), and five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4). R.C. 2907.02(A)(1)(b) provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.03(A)(5) states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.05(A)(4) provides that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶8} "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶9} A.T.'s parents were divorced in 2004, and she and her sisters, L.T. and J.T., spent time at both her mother's and father's homes. A.T. also has a younger half-brother who solely

lived with A.T.'s mother. A.T. and her sisters would spend Tuesday night to either Saturday or Sunday morning at her father's house and would spend the remainder of the time at A.T.'s mother's house. When A.T. was in the fourth or fifth grade, her mother began dating Renaud. Sometime thereafter, A.T.'s mother moved to an apartment in Twinsburg and Renaud moved in as well. A.T. described her relationship with Renaud at that time as "perfectly normal."

{¶10} Eventually, A.T.'s mother and Renaud married and moved into a house in Twinsburg. A.T. indicated that, for a while, Renaud's son, Austin, had a bedroom in the basement of the house; however, after Austin stopped staying over, A.T. took over the bedroom in the basement. A.T.'s mother, called as a witness of the court, indicated that A.T. moved into the bedroom in the basement around January or February 2013 and would have stayed there until Renaud's daughter Ashely moved into the basement with her daughter, and her boyfriend and boyfriend's son sometime in July 2013. Ashley lived in the basement for the following eight or nine months. A.T.'s mother testified that Renaud decided that A.T. could move into the basement after Austin left and before Ashley moved in "because it was wasted space and he felt like he would give her this treat."

{¶11} A.T. indicated that after she moved into her own bedroom in the Twinsburg house, Renaud started asking her more personal questions, would hug her every day, and tell her she was beautiful but would not do the same with her other siblings. The siblings noticed that Renaud was treating A.T. differently and that A.T. was receiving privileges that they were not. For instance, Renaud, who worked for Coca-Cola as a delivery person, often brought sodas and energy drinks home from work and shared them only with A.T. Further, if A.T., who was a picky eater, would abstain from dinner, Renaud would bring her cookies to eat. Where A.T.'s siblings would receive punishments for certain behaviors, A.T. would only receive a verbal

reprimand. A.T.'s sister, J.T. confirmed in her testimony that A.T. was in fact treated differently than the other children. J.T. maintained that Renaud would buy A.T. things but would not buy the same things for the other siblings and indicated that the other children received more harsh punishments than A.T.

{¶12} A.T. testified that her mother usually left for work before they got home from school and would not be home until around midnight. Whereas Renaud usually got home from work around the time she and her siblings got home from school. A.T. described that, after Renaud got home from work he would always shower. A.T. stated that after school she would usually take a nap and Renaud would come into her room and lay with her. Initially, he would just nap with her, but over time, it progressed to spooning and holding her from the back. Later, he developed what A.T. described as a "routine." While he had his arm around her, he would take his hand and move up and down from her stomach towards her chest and down her thighs. As he would get more comfortable Renaud would keep his hand in the area of her chest longer. He would then move his hand to her back and up the back of her bra strap. A.T. described that with each encounter Renaud would go a little further and then that would become part of his "routine." Renaud progressed to moving his hand under her shirt and bra and cupping A.T.'s breasts. He also would graze her crotch with his finger and progressed to putting his hand under her shorts and underwear and touching her vagina. Ultimately, on two or three occasions, Renaud inserted his fingers into her vagina. A.T. testified that it hurt when he stuck his fingers in her vagina. A.T. averred that Renaud's hands felt like sandpaper on her skin and that he was always sweaty by the time he was done assaulting her.

{¶13} A.T. testified that most of the abuse occurred in her bedroom in the basement, although she asserted that she thought it did happen twice in her mother's bedroom, and that the

abuse happened once or twice a week while she was at her mother's house. A.T. maintained that the abuse began towards the end of her sixth grade year when she was 12 and ended during the middle of her seventh grade year, "a little bit after [she] turned 13." A.T. approximated that Renaud touched her thighs and breasts between 9 and 11 times and that the abuse happened over a period of around a year.

{¶14} A.T. indicated that the abuse stopped after her mother was home more, A.T. started "hav[ing] an attitude towards [Renaud,]" and A.T. became closer to her mother. A.T. interpreted Renaud's favoritism as his way of him nonverbally telling her not to say anything. She thought that Renaud perceived her change in attitude towards him as an indication that she might say something about the abuse, and so he stopped it.

{¶15} At the time the abuse was happening, A.T. initially did not realize that it was wrong. However, as the abuse progressed she did realize it was wrong but was afraid of Renaud and what he might do and so did not tell anyone about it. As A.T. kept the secret longer and longer, it began to take a toll on her. She began to try to avoid Renaud by getting more involved with sports and going out with friends. She also developed a lot of anger and was not "a nice person."

{¶16} Around Christmas 2014, A.T. sent her friend a message indicating that she wanted to disclose something but her friend could not "call child protective services." A.T.'s mother grabbed her phone and demanded to know what was happening. A.T. did not disclose the totality of the abuse, instead only sharing that Renaud had been spooning her and that she was uncomfortable with how close he was being. After which, A.T.'s mother and Renaud got into a big argument, Renaud moved out, and A.T. did not see him again until trial. Renaud denied that he did anything inappropriate.

{¶17} After Renaud moved out, A.T.'s mother began experiencing financial difficulties due to the loss of Renaud's income. A.T. knew her mother was on food stamps and that they went to the food bank a couple of times. The house also fell into foreclosure. In October 2015, A.T. texted her mother to ask how much counseling cost. This caused A.T.'s mother to ask the circumstances of why she needed counseling and, at that point, A.T. disclosed the full extent of the abuse to her mother. The exchange of text messages was read to the jury. In that series of messages, A.T. described Renaud's "routine" in much the same way she described it at trial. In addition, she described that, at the end of the abuse, Renaud would get up and tell her she was beautiful, kiss her forehead, and leave. In the text messages, A.T. told her mother that the abuse happened seven to nine times and he digitally penetrated her two to four times. The exchange was admitted into evidence as an exhibit.

{¶18} Following this disclosure, the allegations were reported to the police. Officer James Swope of the Twinsburg Police Department responded to the house. A.T.'s mother reported that A.T. had sent her text messages detailing sexual abuse by A.T.'s stepfather, Renaud. A.T.'s mother showed the text messages to Officer Swope. Officer Swope spoke with A.T. who indicated the abuse happened at the end of her sixth grade year, the beginning of her seventh grade year and that it happened approximately two and half years before October 2015. A.T. told Officer Swope that she came forward when she did because her mother had a restraining order against Renaud and she finally felt safe. A.T. reported that the abuse happened in the basement and relayed a similar pattern of abuse as the routine she described at trial. She also described Renaud's hands as being cracked and rough.

{¶19} Detective Brian Donato of the Twinsburg Police Department further investigated A.T.'s allegations. Detective Donato discussed that, based on his training and experience, when

a victim comes forward and describes statements "through the senses," i.e. what the victim is smelling, tasting, or feeling, it is a "real statement." Detective Donato did not view A.T.'s mother's and Renaud's divorce as a reason for A.T. to fabricate the allegations. He believed that divorce proceedings were initiated sometime in early November 2015. Detective Donato scheduled an appointment for A.T. to be interviewed and examined at the CARE Center. Following the interview and exam at the CARE Center, police interviewed A.T. again, and A.T. reported that in total, "between seven and nine times[, Renaud] stuck his fingers in her vagina."

{¶20} A.T. spoke with a social worker and had a medical examination at the CARE Center. The interview with the social worker was played for the jury and admitted into evidence. During the interview, A.T. detailed the abuse. She stated that the abuse began at the end of sixth grade or the beginning of seventh grade and always happened in the basement, except for one time, during which Renaud abused her in her mother's room. When Renaud finished assaulting her, he would kiss her forehead and tell her she was beautiful. During the abuse, she would hear heavy breathing and Renaud would get really sweaty by the end. A.T. also relayed the privileges Renaud would bestow upon her. A.T. averred that the abuse happened approximately five to seven times and during the last two or three, Renaud put his fingers inside her vagina. A.T. told the social worker that Renaud stopped around the time she was 12 or 13. The social worker discussed that most of the interviews she conducts involve delayed disclosures, like A.T.'s. She explained that often children are afraid to report the abuse. The social worker believed that Renaud employed grooming with A.T. based upon the information A.T. shared about favoritism. The social worker described grooming as getting the child "comfortable or expecting a reward in order to cooperate[.]" The social worker testified that, in her experience, children are not always

accurate with respect to the recollection of dates and times. She averred that "[u]sually, when kids are traumatized they can't recall that information [as to time or date.]"

{¶21} Following the interview, A.T. was examined by a nurse practitioner. The nurse practitioner relayed that the history she received about A.T. was that she was abused beginning in the sixth or seventh grade and that the abuse stopped when she was 13. The nurse practitioner ultimately arrived at a diagnosis of child sexual abuse. The exam findings did not reveal any injuries or abnormal findings. However, the nurse practitioner indicated that the absence of findings was consistent with digital penetration; she indicated that A.T.'s body would have healed given the time that had elapsed, and it was also possible, that in light of the conduct alleged, that A.T. would have not suffered any demonstrable injury even at the time of the abuse. The nurse practitioner testified that, in approximately 95% of cases, no tearing, bleeding, or other physical injuries are discovered during the examination. The nurse practitioner also indicated that most of the children seen at the center are delayed reporters.

{¶22} Additionally, A.T. began seeing a therapist for outpatient counseling following her disclosure. The therapist's notes reflect that A.T. was abused over a three to four month period and that the abuse included digital penetration. However, A.T. did not disclose many details of the sexual abuse to the therapist. A.T. did report experiencing at least three years of nightmares and flashbacks associated with the abuse and was diagnosed with major depression and posttraumatic stress disorder. Additionally, the therapist noted that A.T. was initially very angry, but that subsided with treatment. The therapist testified that A.T. stated that she did not tell her mother because A.T. did not think she would be believed and she did not like to create conflict.

{¶23} The therapist also discussed the concept of grooming, which she described as an adult befriending a child and creating an emotional connection that's separate from other children in the household. Grooming can include giving presents to only the one child or sparing the one child from punishments that would be imposed on the other children. The therapist also noted that delayed disclosure, such as A.T.'s, was not uncommon. According to the therapist, A.T. never indicated an ulterior motive for reporting the abuse.

{¶24} After reviewing the record, and in light of Renaud's limited arguments on appeal, we conclude that sufficient evidence was presented to support Renaud's convictions. Renaud has presented no case law establishing that physical evidence is necessary to uphold convictions for rape, sexual battery, and gross sexual imposition, and in fact, case law provides just the opposite. *See State v. Gordon,* 9th Dist. Summit No. 28191, 2017-Ohio-5796, ¶ 29; *State v. Adams*, 9th Dist. Lorain No. 05CA008685, 2005-Ohio-4360, ¶ 13. Further, arguments related to alleged conflicts in the testimony would go to issues of weight and credibility, not sufficiency. *See State v. Ball,* 9th Dist. Summit No. 26537, 2013-Ohio-3506, ¶ 4.

{¶25} With respect to Renaud's argument that there was insufficient evidence that A.T. was under the age of 13 at the time of the abuse, we disagree. We first note that the two counts of sexual battery under R.C. 2907.03(A)(5) do not include as an element that the victim was less than 13 years of age. With respect to the remaining charges, the testimony evidences that most of the abuse, aside from one or possibly two occasions, happened in the basement in her bedroom. A.T.'s mother testified that A.T. would have had her bedroom in the basement from around January or February 2013 until July 2013. At that time, A.T. would have been 12 years old. A.T. also testified that the abuse began towards the end of her sixth grade year when she was 12 and ended during the middle of her seventh grade year, "a little bit after [she] turned 13."

A.T. told Officer Swope that the abuse happened at the end of her sixth grade year, the beginning of her seventh grade year and that it happened approximately two and half years before October 2015, which would have been around April 2013, when A.T. was 12 years old. Based upon the foregoing, we conclude there was sufficient evidence, when viewed in a light most favorable to the prosecution, from which a reasonable trier of fact could conclude that Renaud committed the crimes alleged when A.T. was less than 13 years old.

{¶26} Further, we determine there was sufficient evidence to support the verdicts in this matter. There was evidence that on at least 5 occasions, while A.T. was 12, Renaud touched A.T.'s breasts and thighs for the purpose of sexual arousal or gratification. *See* R.C. 2907.05(A)(4); R.C. 2907.01(B). There was also testimony that on at least two occasions, while A.T. was under 13 years of age, Renaud, A.T.'s stepfather, inserted his finger into A.T.'s vagina. *See* R.C. 2907.02(A)(1)(b); R.C. 2907.03(A)(5); R.C. 2907.01(A). Thus, we cannot conclude based upon Renaud's arguments on appeal that the verdicts for rape, sexual battery, and gross sexual imposition were based upon insufficient evidence.

{¶27} Renaud's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT [OF THE] EVIDENCE AND, AS A RESULT, APPELLANT RENAUD'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED[.]

{¶28} Renaud argues in his second assignment of error that the verdicts were against the manifest weight of the evidence. Specifically, he asserts that there was no physical evidence to support A.T.'s allegations and there was conflicting testimony about the location and timeframe of the sexual abuse.

{¶29} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶30} Here, Renaud has alleged in a conclusory fashion that his convictions are against the manifest weight of the evidence because of the lack of physical evidence and conflicts in the evidence concerning the location and timeframe of the abuse. The jury heard that oftentimes in cases of delayed disclosures, like A.T.'s, no physical evidence of abuse is discovered. The jury also heard that, in light of the allegations of digital penetration, it was possible there would have been no physical injury evident even at the time of the assaults. Finally, the nurse practitioner testified that, in approximately 95% of cases, no tearing, bleeding, or other physical injuries are discovered during the examination.

{¶31} As to any conflicts in the evidence with respect to the location and timeframe of the abuse, the social worker testified that, in her experience, children are not always accurate with respect to the recollection of dates and times. The social worker averred that "[u]sually,

when kids are traumatized they can't recall that information [as to time or date.]" Thus, even though A.T.'s accounts of how often the abuse happened, when it happened, and where it happened varied to a certain degree, the jury could nonetheless have reasonably believed that, on at least two occasions, Renaud, A.T.'s stepfather, digitally penetrated her, and, on at least five occasions, Renaud touched A.T.'s breasts and/or thighs for the purpose of sexual arousal or gratification. Likewise, the jury could have reasonably found that Renaud did so when A.T. was less than 13 years old.

**{¶32}** We remain mindful that the jury had an opportunity to view the witnesses and "was in the best position to assess the credibility of the evidence presented by the parties at trial." *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 22. "[T]his Court will not overturn the [] verdict[s] on a manifest weight of the evidence challenge simply because the jury chose to believe certain witnesses' testimony." (Internal quotations and citations omitted.) *State v. Binford*, 9th Dist. Summit No. 27950, 2016-Ohio-7678, ¶ 10. After a thorough and independent review of the entire record, we cannot say that a manifest miscarriage of justice occurred when the jury found Renaud guilty of the charged offenses.

**{¶33}** Renaud's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN ADMITTING THE HEARSAY TEXT MESSAGES BETWEEN A[.]T[.] AND HER MOTHER[.]

**{¶34}** Renaud argues in his third assignment of error that the trial court erred in admitting the text messages between A.T. and A.T.'s mother because the messages were hearsay and not prior consistent statements as found by the trial court.

**{¶35}** During opening statements, Renaud's counsel told the jury that both A.T. and Renaud were victims in the case. Renaud's counsel asserted that A.T. was being manipulated by

her mother because of her mother's anger and vindictiveness, and Renaud was the victim of A.T.'s mother as well. Defense counsel maintained that Renaud was the ultimate loser in the divorce. Thus, defense counsel implied that A.T. had fabricated the allegations at the behest of her mother.

**{¶36}** Following openings statements, and prior to the first witness being called, the State announced that it sought to introduce a series of text messages between A.T. and her mother. The State argued that it was not offering the messages for the truth of the matter asserted therein, but to counteract the allegations that A.T. had fabricated the abuse. The State asserted that the texts were prior consistent statements that were not hearsay and cited *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, in support. *See id.* at ¶ 92-114. Defense counsel objected arguing that the text messages were hearsay and that they did not fall within the type of statements contemplated by *Lang*. The trial court ruled in favor of the State.

**{¶37}** During A.T.'s testimony, the State had A.T. read most if not all of the text messages. The text messages at issue were sent at the end of October 2015. In those messages, A.T. first asks her mother how much counselors cost because she does not want to waste money. After some prodding, A.T. then details the abuse including the general routine that Renaud would engage in with her. The details of the abuse are generally consistent with the details A.T. testified to at trial. The messages also discuss what should be done after the disclosure, including telling A.T.'s father and the authorities.

**{¶38}** The existence of the texts was also discussed at other points in the trial and defense counsel cross-examined A.T. about the messages. Over objection, the trial court admitted the exhibit detailing the text messages into evidence.

{¶39}  "The decision to admit or exclude evidence lies in the sound discretion of the trial court.  Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review."  (Internal quotations and citations omitted.)  *State v. Stark*, 9th Dist. Wayne No. 14AP0050, 2017-Ohio-873, ¶ 22.

{¶40}  Under Evid.R. 801(D)(1)(b), "[a] statement is not hearsay if * * * [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]"  "Prior consistent statements that an offering party seeks to introduce to rehabilitate its witness must have been made before the alleged influence or motive to fabricate arose to be admissible under this rule."  (Emphasis omitted.)  *Lang* at ¶ 107; *see also State v. Edwards,* 9th Dist. Lorain No. 97CA006775, 1999 WL 548963, *3 (July 28, 1999).

{¶41}  The trial court admitted the testimony about the text messages to allow the State to rebut defense counsel's allegations in the opening statement that A.T. fabricated the allegations in order to please or help her mother.  Defense counsel attempted to connect A.T.'s mother's divorce from Renaud to the delayed disclosure of the allegations.  It is unclear from the record when the divorce proceedings began; however, there was some testimony that early November 2015 marked the beginning of the divorce proceedings.  Thus, it is difficult to say for certain whether the texts were sent before "the alleged influence or motive to fabricate arose[.]"  *Lang* at ¶ 107.

{¶42}  Nonetheless, even if the text messages were not admissible as prior consistent statements, Renaud has failed to explain how the admission of the text messages prejudiced him.  While Renaud mentions the harmless error standard, he fails to offer any argument as to how the

admission of the testimony or exhibit prejudiced him. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *see also State v. Lauf,* 3d Dist. Putnam No. 12-16-06, 2017-Ohio-608, ¶ 73-74 (concluding in a case involving the sexual abuse of a child, that, even assuming that the timing requirements of Evid.R. 801(D)(1)(b) were not met, the evidence was cumulative to other admissible evidence and thus any error in admission was harmless.).

{¶43} Accordingly we cannot say that Renaud met his burden to demonstrate reversible error on appeal and overrule his third assignment of error on that basis.

### III.

{¶44} Renaud's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

DONALD R. HICKS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.