[Cite as *State v. Gordon*, 2017-Ohio-5796.]

| | | |
|---|---|---|
| STATE OF OHIO | )<br>)ss: | IN THE COURT OF APPEALS<br>NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 28191 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT<br>ENTERED IN THE |
| BRUCE L. GORDON | COURT OF COMMON PLEAS<br>COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2015 03 0656 |

DECISION AND JOURNAL ENTRY

Dated: July 12, 2017

CARR, Judge.

{¶1} Defendant-Appellant Bruce L. Gordon appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms in part, reverses in part, and remands the matter for proceedings consistent with this opinion.

I.

{¶2} In March 2015, Gordon was indicted on two counts of rape in violation of R.C. 2907.02(A)(1)(b). The indictment included factual allegations that Gordon purposely compelled the victims to submit by force or threat of force. Additionally, Gordon was charged with three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4). The allegations involved Gordon's three stepdaughters, K.A. (born in 2006), R.A. (born in 2007), and S.A. (born in 2009). The matter proceeded to a jury trial, at which the jury found Gordon guilty of the charged offenses. With respect to the rape counts, the jury specifically found that both victims, K.A. and R.A., were under the age of ten at the time of the offense and that they were compelled to submit

by force or threat of force. The trial court sentenced Gordon to an aggregate term of fifty-five years to life in prison.

{¶3} Gordon has appealed, raising seven assignments of error for our review, which will be discussed out of sequence to facilitate our analysis.

II.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT COMMITTED REVERSIBLE [ERROR] WHEN IT FOUND MR. GORDON GUILTY OF RAPE AND GROSS SEXUAL IMPOSITION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT SUCH FINDINGS.

**ASSIGNMENT OF ERROR III**

MR. GORDON'S CONVICTIONS FOR RAPE AND GROSS SEXUAL IMPOSITION ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4} Gordon argues in his second assignment of error that his convictions are based on insufficient evidence. He asserts in his third assignment of error that his convictions are against the manifest weight of the evidence. He bases both arguments on that fact that "there was no physical evidence linking [] Gordon to the crimes, the children did not personally identify [] Gordon as the perpetrator during the trial, or were coached to say it was [] Gordon by others; and that the children had been previously exposed to sexualized behavior by their mother."

{¶5} Gordon was convicted of two counts of violating R.C. 2907.02(A)(1)(b) and three counts of violating R.C. 2907.05(A)(4). R.C. 2907.02(A)(1)(b) states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Sexual conduct

means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶6} R.C. 2907.05(A)(4) provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * "[t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**Sufficiency**

{¶7} A review of the sufficiency of the evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. *State v. Gulley*, 9th Dist. Summit No. 19600, 2000 WL 277908, *1 (Mar. 15, 2000). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶1}   K.A.'s, R.A.'s and S.A.'s father died in 2010.   Ultimately, the girls' mother ("Mother") began dating Gordon, whom she knew from high school.   The two began living together and then married.   Following the death of their father, K.A. and R.A. began going to counseling to address some issues the girls developed.   Mother also attended counseling.   S.A., who was significantly younger, did not begin counseling until the fall of 2012.   With counseling, the concerns were improving until late 2014 or early 2015, when Mother noted some problems with the girls.   R.A. who was 8 at the time, began wetting the bed, and she had never done so in the past.   She also seemed more depressed.   All three girls also began exhibiting sexual behaviors, such as rubbing their genitals on the corners of furniture and masturbating.   To address these issues, Mother increased the counseling sessions to once a week, along with some group therapy sessions.   However, at this point Mother did not suspect the girls were sexually abused; the counselor noted that sometimes the behaviors could be perfectly normal.   Mother testified that the family had been under financial stress during this time and that she was expecting another child, a son.   She averred that they had filed for bankruptcy and were planning to give up the house.   They expected to move out by the end of February.   The girls knew about it and were not happy.   K.A. had also recently had surgery to correct a bladder issue.

{¶2}   Mother did testify that, about a week prior to the girls coming forward with allegations of sexual abuse, around 2:30 a.m., she had gone to the bathroom and noticed Gordon coming upstairs from the basement followed by K.A., who was only in her bra and underwear. When Mother asked Gordon about it, he said that K.A. wanted to spend some time with him and that they were playing Legos.   Mother was surprised by this because it was a school night.

{¶3}   Mother also acknowledged that at some point, during the summer, K.A. had been exposed to pornography.   She indicated that the incident had occurred when she was babysitting

other children at their home. The children were upstairs and K.A. was with them. When Mother went upstairs to check on them they all got quiet. When K.A. and Mother went home, she overheard K.A. asking R.A. if R.A. knew how to spell sex. When Mother questioned the girls, K.A. told her that one of the children Mother babysat had showed her "some bad videos" and told her a little bit about what was on the videos. Mother never saw the videos. Mother told the counselor about it and the counselor discussed it with K.A.

{¶4} On February 8, 2015, the family was supposed to go to a party at Mother's parents' house. However, K.A. was not feeling well. Gordon agreed to stay home with K.A. so that Mother, R.A., and S.A. could go to the party. When Mother got home around 8 p.m., she noticed that Gordon was in K.A.'s bed with her watching a movie. They were both clothed. Nonetheless, Mother thought that was odd because Gordon had never done that before.

{¶5} The next morning, K.A. told her sisters that Gordon had licked her private spot. R.A. reported this to Mother who proceeded to talk to each girl individually about whether Gordon had abused them. R.A. and S.A. reported that Gordon had also touched them. Mother was shocked by what she was told. When Gordon came home, she confronted him. He was very calm, which, according to Mother was unusual, as he typically became very angry when confronted with any type of allegations. Gordon told Mother that he would never do anything to hurt the girls. Mother then had the girls repeat the allegations. At this point, Gordon stated that if he did it, it was an accident.

{¶6} Mother then took the girls to her counselor and went to a couple stores. When she came home, the girls' counselor returned her phone call and told her that the counselor had to report the incident and that Children Services would call her. Children Services called shortly thereafter and told Mother she could not stay at the house with Gordon. Mother first took the

girls to her sister's house but later took them to her parents' house. Children Services called the police and Mother spoke with police the next day. Police told Mother to make an appointment with the Children at Risk Evaluation ("CARE") Center. Mother did so, and an appointment was made for approximately two weeks later.

{¶7} The girls were interviewed and medically examined at the CARE center. The videos of the interviews were admitted as exhibits and portions were played during trial. The interviewer testified that she was trained to interview children and that she asks open-ended, non-leading questions in her interviews. She stated that her role is to conduct a diagnostic interview so that the children can receive any medical care they might need. She averred that the girls did not display any indicators that they had been coached.

{¶8} During the interview, K.A. reported multiple instances of sexual abuse. With respect to the incident that started the investigation, K.A. indicated that while she and Gordon were in her bedroom, Gordon told her to take off her clothes, which she did, and he pulled down her underwear. He told her to lie down on her back with her legs in the air and said he was going to check her for rashes. Gordon then licked her vagina and told her that what happened was no one else's business. Additionally, K.A. discussed multiple incidents of Gordon putting his finger up her vagina while they were watching TV and also incidents of him putting his finger in her sisters' vaginas. He also rubbed her vagina. K.A. also discussed an incident when she and Gordon were in the basement and Gordon asked her to touch his private spot, which she stated was his penis. K.A. said no and went to her room. She also described Gordon having his penis exposed and moving his hand up and down.

{¶9} During her interview, R.A. indicated that Gordon touched her private spot a couple times with his hand and that he rubbed her private spot. R.A. stated that she told him to

please stop and he would, but then after a couple days he would touch her again. She described her private spot as where pee comes out. R.A. stated that it would happen when Mother was gone and while they would watch TV in Mother's and Gordon's room. She told the interviewer that she also saw Gordon's private spot a couple times.

{¶10} S.A., in her interview, stated that Gordon put his hand in her private spot and tickled it while she was in her parents' room while they were watching TV during a commercial. She indicated it would happen when Mother was at the store or her sisters were not in the room and that it happened twice. S.A. told the interviewer that Gordon would be naked that she would see his private spot sticking up under the blanket. S.A. described her private spot as where she pees and poops.

{¶11} The girls were also examined by Donna Abbott, a nurse practitioner. Ms. Abbott testified that she did not utilize a rape kit because over 72 hours had passed since the last incident of abuse. Thus, no DNA was collected. Ms. Abbott testified that she did not observe anything abnormal during the physical exam, which she indicated was not uncommon in light of what the girls reported had happened. She made an assessment of child sexual abuse with respect to all three girls.

{¶12} After the CARE Center examinations, Detective Scott Rubes spoke with Mother and instructed Mother on initiating a one-party consent phone call with Gordon in an attempt to get Gordon to admit to the abuse. The phone call was played for the jury and admitted into evidence. Mother told Gordon that she loved him and that she wanted to be able to stay with him, but that she needed to know what happened, that Gordon was sorry, that it would not happen again, and that he would get help. She testified that she lied to him in order to get information from Gordon. During the phone call, Gordon stated that he may have accidentally

touched the girls while tickling them. He denied licking K.A. and surmised that, if she felt anything wet, it was probably his finger when he was examining her because she said she had a rash that hurt. He also indicated that he was sorry and prayed for forgiveness. Later in the call, he stated that what happened with R.A. and S.A. was an accident but indicated that K.A. asked him to do it, although not blatantly. He testified that K.A. was curious about something she saw in a movie, it was over her underwear, and that she really liked it. He told Mother that he stopped, that he felt really bad, and would never do it again.

{¶13} Detective Rubes also interviewed Gordon, and a portion of that interview was played for the jury. During the interview, Gordon appeared very tearful and expressed that he was sorry. He agreed that he regretted touching the girls. He remembered feeling guilty and indicated that it was just K.A. but he did not remember a lot. He remembered stopping and saying he was sorry. He denied licking K.A.'s vagina and stated he was only looking to see if it was inflamed following her surgery as she was complaining that she was in pain.

{¶14} Detective Rubes testified that he also obtained a warrant to search Gordon's phone for child pornography. He did so because he was concerned there may have been evidence on the phones based upon comments Gordon made to his mother over phone calls that were made while he was in Summit County Jail. No evidence, however, was obtained from the phone. Detective Guy Sheffield was part of the computer forensics unit with the Akron Police Department. Detective Sheffield was charged with recovering the stored data on the phone. When Detective Sheffield received the phone, it was in working condition, however, it was pass code protected. In the process of trying to recover the data, Detective Sheffield damaged the phone and nothing could be obtained from it. Detective Sheffield sent the phone to the cyber crimes unit at the Ohio Bureau of Criminal Investigation ("BCI") to see if the data could be

recovered.  BCI was unsuccessful in its recovery efforts and no information was obtained from the phone.

{¶15}  All three girls testified at trial.  K.A. recounted multiple instances of abuse.  She stated that, one time, while she and Gordon were in the basement, he asked her to touch his private part and she said no.  She then stated that he "started to like put his finger up" and she told him to stop and he kept doing it.  When asked to describe what she meant, she stated that he was "picking on [her] private part[]" with his finger.  She also testified that there was a time in her room while they were watching a movie when he told her to pull down her pants down in order to check for infection and he licked her "private spot[.]"  She also averred that there was an instance when the three girls were roughhousing and Gordon told them to settle down.  The girls laid on him and K.A. stated that "he just st[u]ck his finger right up us."  K.A. identified Gordon at trial.

{¶16}  R.A. testified that, more than once, Gordon touched her "down in [her] private spot[]" when she and Gordon were in her parents' room on their bed.  She would sometimes tell him to stop but he would not.  She indicated that he "would always pull down [her] clothes and pull down his clothes."  R.A. stated that she uses her private spot to go to the bathroom.  R.A. also identified Gordon at trial.

{¶17}  S.A. testified that, more than once, while she and Gordon were in her parents' room watching TV, Gordon "touched [her] private spot" with his fingers under her underwear.  S.A. averred that Gordon was naked when this happened.  She stated that she did not see his private spot because it was under a blanket.  S.A. was not asked to identify Gordon at trial.

{¶18}  The girls' counselors also testified about their sessions and the summaries of those records were admitted into evidence.   Jennifer Knobloch, who counseled K.A. and S.A.

testified that, in April 2015, K.A. reported that, over the course of the last year, Gordon abused her 20 to 30 times but only licked her once. At other sessions, K.A. told her counselor about times that Gordon had touched her vagina. K.A. began having difficulty concentrating at school and her grades dropped. Ms. Knobloch testified that such could be normal for a child experiencing trauma. K.A. additionally reported that Gordon abused her sisters.

{¶19} Ms. Knobloch testified that during their sessions, S.A. also disclosed instances of abuse. S.A. reported that, while she and Gordon were watching TV, there were two occasions that he tickled her vagina under her underwear. She indicated that Gordon was naked on these occasions. S.A. later described Gordon putting his hand in her pants and up her vagina. She stated that he was naked and his private area was standing up under the blanket. She reported that Gordon moved his hand around on his private area.

{¶20} Ms. Knobloch indicated that both girls began displaying boundary issues; Mother had observed the girls inappropriately touching each other and the girls began exhibiting sexualized play. S.A., who was five at the time, also had been caught masturbating and sticking tissues up her vagina to make her sisters laugh. Ms. Knobloch explained that boundary issues and prepubescent masturbation are common in children that have been sexually abused. Both girls also expressed fears of Gordon, including what he would do during the time he was out on bail.

{¶21} On cross-examination, Ms. Knobloch acknowledged that there were other significant life changes happening in the girls' lives. Mother moved in with her boyfriend in the fall of 2015, whom she had only known for a short time. Additionally, K.A. witnessed a domestic altercation between Mother's boyfriend's daughter and Mother that resulted in K.A.'s

baby brother being hit with a cell phone. However, Ms. Knobloch opined that those incidents would not have caused the sexualized behaviors that were reported.

{¶22} Sarah Cool, R.A.'s counselor, testified about their sessions. Initially, after the disclosure of abuse, R.A. was reluctant to discuss the incidents during counseling. Ms. Cool testified that in April 2015, Mother had reported to Ms. Cool that R.A. seemed depressed, had been withdrawing, was urinating in her pants, and had been sucking her thumb. Ms. Cool told Mother that those symptoms were typical symptoms after sexual abuse. In October 2015, R.A. reported that Gordon "put his vagina in [her] vagina." She stated that this happened a couple of times when Mother was at the store and her sisters were in their room. R.A. had wanted to watch TV with Gordon and he put her on her lap and "did that." She told Gordon to stop once but he did not say anything or stop. Additionally, R.A. recalled that one time, Gordon "sprayed pee in [her] mouth and said it's what babies eat[.]" She described the pee as being white in color. R.A. also reported that the abuse started "a long time ago." Like her sisters, R.A. also expressed fear about Gordon being out on bail.

{¶23} Both counselors acknowledged that they accept what children tell them at face value and that it is not their role to evaluate whether the children are being truthful.

{¶24} Gordon testified in his defense. He denied engaging in any sexual conduct with K.A. or R.A. and denied having any sexual contact with any of the three girls. He described his relationship with the girls as very solid. He stated that K.A. often complained of pain following her bladder surgery, and that after she raised the issue with him a couple times, he decided to "look and see if there [were] any issues with it." He explained that when he would play with the girls, often he would chase them around, they would jump on the bed, and then he would jump on the bed and tickle them. Gordon surmised that the girls may have seen him naked the times

when he came home around 3 or 4 in the morning and changed in his bedroom with the door open. He stated that his bedroom was directly across from R.A.'s and S.A.'s room.

{¶25} With respect to February 9, 2015, Gordon indicated that he was "confused and distraught" after Mother accused him of abusing the girls. He indicated that, when Mother asked the girls to repeat the allegations, the girls did not really know what to say and did not really convey anything. As to the one-party consent phone call, Gordon testified that he told Mother what she wanted to hear and so he admitted to assaulting the girls. He indicated that he would have said or done anything to keep his family together. He testified that he lied to both Mother and to Detective Rubes in the interview in hopes that he could ultimately go home to his family. Gordon opined that Mother may have coached the girls. He speculated that her motive could have been related to their strained financial situation and/or because she might have wanted to get Gordon out of the picture so that her new son could carry on her deceased husband's family name. Otherwise, he could think of no good reason why the girls would make up the accusations.

{¶26} After reviewing the evidence in a light most favorable to the prosecution, we conclude sufficient evidence was presented whereby a jury could conclude that Gordon engaged in sexual conduct with K.A. and R.A. and that he had sexual contact with all three girls. *See* R.C. 2907.02(A)(1)(b) and 2907.05(A)(4); *see also State v. Pistawka*, 9th Dist. Summit No. 27828, 2016-Ohio-1523, ¶ 16 (discussing that a trier of fact can infer that defendant's purpose of engaging in behavior was for sexual arousal or gratification based upon the type, nature, and circumstances of the contact, and the personality of the defendant). There was evidence that Gordon licked K.A.'s vagina, put his finger in it, and rubbed it. R.A.'s counselor testified that R.A. told her that Gordon "put his vagina in [her] vagina" and "sprayed pee in [her] mouth and

said it's what babies eat[.]" Additionally, R.A. testified that Gordon touched her private spot. S.A. testified that Gordon "touched [her] private spot" with his fingers under her underwear.

{¶27} On appeal, Gordon has argued that his convictions must be reversed because "there was no physical evidence linking [] Gordon to the crimes, the children did not personally identify [] Gordon as the perpetrator during the trial, or were coached to say it was [] Gordon by others; and that the children had been previously exposed to sexualized behavior by their mother." While Gordon's arguments would seem more appropriately raised in the context of the weight of the evidence, we will briefly address them here.

{¶28} Gordon has pointed to no case law requiring that the victims identify the defendant in court in order for there to be sufficient evidence to support convictions for rape and gross sexual imposition. Nonetheless, both K.A. and R.A. did identify Gordon in court as their abuser. Further, the record is clear that the allegations of abuse all relate to conduct by Gordon.

{¶29} Gordon has also presented no case law establishing that physical evidence is necessary to uphold convictions for rape and gross sexual imposition. *See State v. Pemberton*, 9th Dist. Lorain No. 05-CA-008660, 2005-Ohio-4659, ¶ 19 (noting that while physical evidence would have strengthened the reliability of the victim's statements, such was not required); *State v. Adams*, 9th Dist. Lorain No. 05CA008685, 2005-Ohio-4360, ¶ 13; *State v. West*, 10th Dist. Franklin No. 06AP-11, 2006-Ohio-6259, ¶ 16-17.

{¶30} Finally, Gordon argues that there was evidence that the girls were previously exposed to pornography, and thus, the girls could have had knowledge of the sexual behaviors discussed in their allegations outside of having actually experienced them. Thus, essentially, it appears that Gordon argues that a reasonable fact finder could conclude that the girls lied notwithstanding their knowledge of adult sexual behaviors. However, such an argument would

relate to the credibility of the girls' testimony, which is not an appropriate consideration in a sufficiency discussion. *See State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9. The evidence discussed above, if believed, was sufficient to support a finding of guilt on the charged offenses.

{¶31} Gordon's second assignment of error is overruled.

**Manifest Weight**

{¶32} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶33} We cannot say that S.A.'s failure to identify Gordon in court when she was not asked to do so and the lack of physical evidence in light of the accusations support the conclusion that Gordon's convictions are against the manifest weight of the evidence. Gordon focuses much of his argument on what he believes were faults and problems with the investigative process. He notes that Mother did not immediately contact the police and instead

contacted a counselor. In addition, he points out that, even though Children Services and the police were aware of the allegations within the 72-hour window during which potential DNA evidence could have been collected, the girls were not medically examined until approximately two weeks later. However, the absence of physical evidence does not negate the evidence indicative of abuse, including the testimony of the girls, the video interviews of the girls, the testimony of their counselors, and Gordon's own admissions which were played for the jury. While Gordon also notes some uncertainties in the girls' testimony, the CARE Center interviewer stated that young children often cannot recall exact timeframes or how often something has happened in light of their brain development. The interviewer averred that it does not concern her when children say that they do not know or do not remember details because sexual abuse disclosures are difficult for children to talk about.

{¶34} Moreover, Gordon alleges that there was testimony that the girls practiced what to say and such further evidenced that they were coached. However, upon clarification from the prosecutor, it appears that the girls were not instructed what precisely to say, and instead were told the most important thing to do was to tell the truth. Finally, Gordon again points to the fact that K.A. was exposed to pornography and discussed it with her sisters as a basis to question the veracity of the girls' testimony. While it is possible that the exposure could have provided the girls with knowledge of adult sexual behavior, we remain mindful that it is unclear what precisely K.A. was exposed to, and what exactly she shared with her sisters. Further, K.A. and her sisters could have seen pornographic images and nonetheless been sexually assaulted by Gordon. Ultimately, the jury had to decide whether it found the girls to be credible. The jury heard that the girls had a good relationship with Gordon and that they loved him. While the family was under financial stress, there was no evidence that Mother had a strong compelling

reason to encourage the girls to fabricate the allegations. Instead, the jury heard Gordon essentially admit to inappropriate conduct in the phone call and interview and then testify that he had lied during the call and interview. We remain mindful that the jury had an opportunity to view the witnesses and "was in the best position to assess the credibility of the evidence presented by the parties at trial." *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 22. "[T]his Court will not overturn the [] verdict[s] on a manifest weight of the evidence challenge simply because the jury chose to believe certain witnesses' testimony." (Internal quotations and citations omitted.) *State v. Binford*, 9th Dist. Summit No. 27950, 2016-Ohio-7678, ¶ 10. After a thorough and independent review of the entire record, we cannot say that a manifest miscarriage of justice occurred when the jury found Gordon guilty of the charged offenses.

{¶35} Gordon's third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE STATE TO INTRODUCE INTO EVIDENCE A PRIVATE RECORDED PHONE CALL BETWEEN A HUSBAND AND A WIFE IN VIOLATION OF THE SPOUSAL IMMUNITY STATUTE.

{¶36} Gordon argues in his first assignment of error that the trial court committed reversible error in allowing the State to play the one-party consent phone call between Mother and Gordon in violation of the spousal privilege statute. The State introduced the call into evidence through Mother's testimony. On appeal, Gordon has not challenged Mother's testimony about the phone call, only the introduction of the phone call itself.

{¶37} We begin by noting that Gordon has only raised issues of spousal privilege, not spousal competency. *See State v. Wilson*, 3d Dist. Putnam No. 15-05-20, 2006-Ohio-2000, ¶ 10 (discussing the difference). R.C. 2945.42 governs the availability and extent of the spousal

privilege in criminal cases. *See id.* at ¶ 11. "The R.C. 2945.42 privilege belongs to the nontestifying spouse." *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 112. R.C. 2945.42 provides in relevant part that:

> Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness, or in case of personal injury by either the husband or wife to the other, or rape or the former offense of felonious sexual penetration in a case in which the offense can be committed against a spouse, or bigamy, or failure to provide for, or neglect or cruelty of either to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age, violation of a protection order or consent agreement, or neglect or abandonment of a spouse under a provision of those sections. The presence or whereabouts of the husband or wife is not an act under this section. The rule is the same if the marital relation has ceased to exist.

The purpose of the statute is "to promote marital peace[.]" (Emphasis omitted.) *State v. Mowery*, 1 Ohio St.3d 192, 198 (1982). "The general thrust of judicial policy is to construe statutory privileges narrowly: [T]hey impede the search for truth and contravene the principle that the public has a right to everyone's evidence." (Internal quotations and citations omitted.) *State v. Nowlin*, 5th Dist. Muskingum No. CT2012-0015, 2012-Ohio-4923, ¶ 41.

**{¶38}** Gordon's counsel filed a motion in limine to exclude the phone call and objected to its presentation to the jury at trial. The trial court denied the motion concluding that the parties were not living in coverture, that the communication was not confidential, and that the communication fell within the exception concerning neglect or cruelty to the children.

**{¶39}** We note that the Ohio Supreme Court has concluded that the admission of spousal communications, such as recorded jailhouse phone calls between the spouses, introduced by means other than the other spouse's testimony, does not violate R.C. 2942.42. *See Perez* at ¶ 122. Accordingly, there is an argument that the introduction of the phone call itself in this case would not amount to testimony as contemplated by *Perez. See id.* at ¶ 110-122. However,

because the phone call was introduced via Mother's testimony, it is arguable that its admission could nonetheless violate R.C. 2945.42. *See id.* at ¶ 122 (holding that, "[b]ecause the jailhouse conversations were *not* introduced by way of [Wife's] testimony, * * * their admission did not violate R.C. 2945.42[]") (Emphasis added.).

{¶40} Even assuming that the spousal privilege was otherwise applicable, we note that other courts have previously concluded that acts of sexual assault against children under the age of 18 can fall within the neglect or cruelty exception. *See State v. Chaney,* 3d Dist. Seneca No. 13-07-30, 2008-Ohio-3507, ¶ 30; *Wilson* at ¶11-13; *State v. Munguia,* 6th Dist. Lucas No. L-88-144, 1989 WL 116909, *4 (Oct. 6, 1989); *State v. Berezoski*, 2d Dist. Montgomery No. 9568, 1986 WL 14770, *37 (Dec. 17, 1986). While not expressly addressing the issue of whether sexual assaults amounted to neglect or cruelty, this Court implicitly agreed that it did in *State v. Paxton*, 9th Dist. Lorain No. 91CA005011, 1991 WL 156562, *1 (Aug. 14, 1991). Therein, we concluded that, in a case involving the rape of the defendant's step-child, the language "neglect or cruelty of either to their children under eighteen years of age" included step-children, and affirmed the trial court's decision allowing the testimony of the wife. *Id.*

{¶41} Further, even if this Court were to conclude that the evidence was privileged and inadmissible, Gordon has failed to demonstrate that the error was not harmless. *See* Crim.R. 52(A). In addition to the admissions made during the phone call with his wife, Gordon made similar admissions during his interview with police. The admissibility of that interview has not been challenged on appeal.

{¶42} Given all of the foregoing, we conclude no reversible error occurred and overrule Gordon's first assignment of error.

**ASSIGNMENT OF ERROR IV**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT SENTENCED MR. GORDON WITHOUT PROPERLY GIVING HIM ALL THE REQUIRED NOTIFICATIONS AS REQUIRED BY R.C. 2929.19(B)(4) AND CONCERNING POST-RELEASE CONTROL.

**{¶43}** Gordon argues in his fourth assignment of error that the trial court erred when it failed to provide the required post-release control notifications at the sentencing hearing. Specifically, Gordon asserts that the trial court did not inform him of the mandatory nature of post-release control and failed to include the consequences of violating post-release control outlined in R.C. 2929.141(A)(1). While Gordon also discusses community control notification issues in the body of his argument, Gordon was not subject to community control and those arguments will be disregarded.

**{¶44}** This Court has held that

[I]n order to comply with separation-of-powers concerns and to fulfill the requirements of the post[-]release-control-sentencing statutes, * * * a trial court must provide statutorily compliant notification to a defendant regarding post[-]release control at the time of sentencing. This includes notifying the defendant of the details of the post[-]release control and the consequences of violating post[-]release control. The trial court must also incorporate into the sentencing entry the post[-]release-control notice to reflect the notification that was given at the sentencing hearing[,] which includes incorporating the consequences of violating post-release control.

(Internal quotations omitted.) *State v. Adams,* 9th Dist. Lorain No. 14CA010709, 2016-Ohio-336, ¶ 6. "[W]hen a trial court fails to properly impose post-release control, that portion of its sentence is void and only the offending portion of the sentence is subject to review and correction." (Internal quotations and citations omitted.) *State v. West*, 9th Dist. Summit No. 28051, 2016-Ohio-5694, ¶ 6.

**{¶45}** At the sentencing hearing, the trial court told Gordon that, "if you were to ever get out of prison, when you are released, you will be on five years of post-release control." Gordon

argues that this notification is non-compliant because it does not use the word mandatory. It is true that Gordon would be subject to five years of mandatory post-release control if he were released from prison. *See* R.C. 2967.28(B)(1). However, we conclude that the trial court's use of the word "will" informed Gordon of the mandatory nature of his term of post-release control. *See State v. Grimes,* Slip Opinion No. 2017-Ohio-2927, ¶ 9 ("The court at a sentencing hearing must notify the offender that he or she 'will' or 'may' 'be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for' a felony. R.C. 2929.19(B)(2)(c) and (d)."); *State v. Bloomer*, 122 Ohio St.3d 200, 2009-Ohio-2462, ¶ 68 ("Despite any differences between R.C. 2929.191 and our holdings in *Jordan*, *Hernandez*, and *Cruzado*, at their core, each fundamentally requires a court imposing mandatory post[-]release control to include in the sentencing entry a statement that an offender convicted of a first-or second-degree felony offense *will* be subject to post[-]release control after leaving prison.") (Emphasis sic.); *see also State v. Martin*, 9th Dist. Summit No. 24534, 2009-Ohio-4338, ¶ 5 (noting that use of the word "may" in the sentencing does not "clearly indicate that Martin will be subject to a mandatory term of post-release control of three years[]"); *State v. Rucker,* 1st Dist. Hamilton No. C-150434, 2016-Ohio-5111, ¶ 7 ("The trial court's statement to Rucker that 'you'll be on a period of supervision' was sufficient to notify Rucker of the mandatory nature of his post[-]release control.").

**{¶46}** With respect to whether the trial court was required to notify Gordon at the sentencing hearing of the consequences of violating post-release control outlined in R.C. 2929.141(A)(1), we note that districts are split on the issue and it is currently being reviewed by the Supreme Court of Ohio. *See State ex rel. Cornwall v. Sutula*, 148 Ohio St.3d 536, 2016-

Ohio-7652, ¶ 10 (acknowledging the split); *State v. Brown,* 147 Ohio St.3d 1473, 2016-Ohio-8438.

**{¶47}** The Supreme Court summarized the issue as follows: "Whether the post-release control notification of R.C. 2929.19(B)(2)(e) must include notification of the penalty provisions in R.C. 2929.141(A)(1)-(2), specifically, whether a trial court must inform an offender at the time of sentencing that the commission of a felony during a period of post-release control permits a trial court to impose a new prison term for the violation to be served consecutively with any prison term for the new felony." *Brown.* It is important to note that R.C. 2929.19(B)(2)(e) contains a notification requirement, whereas R.C. 2929.141(A) contains no such requirement.

**{¶48}** Recently, in *Grimes*, in analyzing what the trial court is required to include in a sentencing entry with respect to post-release control, the Supreme Court also discussed the post-release control notifications required at the sentencing hearing. *See Grimes*, Slip Opinion No. 2017-Ohio-2927, at ¶ 9. Notably, the discussion did not include R.C. 2929.141(A).

**{¶49}** This Court has not precisely addressed the issue, although we have spoken on the topic in other contexts. In *State v. McDowell,* 9th Dist. Summit No. 26697, 2014-Ohio-3900, the defendant asked this Court to conclude that, in order for him to be sentenced to an additional 12 months for violating post-release control, the jury had to find that he was in fact on post-release control. *See id.* at ¶ 12. In discussing the issue, we stated:

> When an offender commits a felony during a period on post-release control, R.C. 2929.141(A)(1) permits a trial court to terminate post-release control and impose a new prison term for the violation of post-release control to be served consecutively with any prison term imposed for the new felony. R.C. 2929.141(A)(1). A trial court must inform an offender at the time of sentencing that this consequence may follow from a violation of post-release control. R.C. 2929.19(B)[(2)](e).

*Id.* at ¶ 13.

{¶50} To the extent this Court stated that R.C. 2929.19(B) required a notification concerning the consequences in R.C. 2929.141(A)(1), the language was dicta and not essential to our holding.  Further, in light of the language in *Grimes,* Slip Opinion No. 2017-Ohio-2927, at ¶ 9, we are not inclined to expand the reach of *McDowell.*  Subsequently, in *State v. Mundy*, 9th Dist. Medina No. 15CA0001-M, 2016-Ohio-4685, ¶ 12, a case involving a motion to vacate a void sentence following a direct appeal, this Court concluded that, because R.C. 2929.141(A)(1) does not include a mandatory notification requirement, "the trial court's failure to discuss R.C. 2929.141 at the 2010 sentencing hearing [did] not render Mundy's sentence void."  *Id.*  In so doing, this Court relied on opinions from the Eighth, Twelfth, and Seventh Districts.  *See id.*  In light of the absence of a notification requirement in R.C. 2929.141(A), we continue to hold that a trial court's failure to give an advisement at the sentencing hearing pertaining to the penalties contained in R.C. 2929.141(A) does not render the sentence void, and we additionally conclude that it is not reversible error.  While "the better practice would be to include notification of the potential implications of R.C. 2929.141 when notifying defendants of the other potential implications of post[-]release control[]" under the current state of the law, we cannot say that doing so is required.  *State v. Mullins*, 12th Dist. Butler No. CA2007-01-028, 2008-Ohio-1995, ¶ 14.

{¶51} Gordon's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT SENTENCED DEFENDANT TO CONSECUTIVE TERMS WITHOUT STRICTLY COMPLYING WITH R.C. 2929.14(C).

{¶52} Gordon argues in his fifth assignment of error that the trial court erred when it sentenced him to consecutive prison terms without complying with R.C. 2929.14(C). This Court agrees.

{¶53} "The Supreme Court of Ohio in *State v. Bonnell* held that, '[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings.'" *State v. Redmyer,* 9th Dist. Medina No. 15CA0012-M, 2017-Ohio-572, ¶ 17, quoting *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, at syllabus.

{¶54} R.C. 2929.14(C)(4) states:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶55} Here, while the trial court included the required findings in the sentencing entry, it failed to make those findings at the sentencing hearing. "When a trial court imposes consecutive sentences without making the R.C. 2929.14(C)(4) findings at the sentencing hearing, the remedy

is to remand the matter for resentencing." *State v. Williams*, 9th Dist. Medina No. 14CA0072-M, 2015-Ohio-2197, ¶ 9. Accordingly, Gordon's fifth assignment of error is sustained and the matter is remanded for resentencing.

### ASSIGNMENT OF ERROR VI

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN SENTENCING MR. GORDON FOR GROSS SEXUAL IMPOSITION AS A FELONY OF THE THIRD DEGREE INSTEAD OF A FELONY OF THE FOURTH DEGREE, BECAUSE THE JURY VERDICT FORM DID NOT INCLUDE THE DEGREE OF THE OFFENSE, NOR ANY AGGRAVATING ELEMENTS.

### ASSIGNMENT OF ERROR VII

MR. GORDON WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN HIS TRIAL COUNSEL FAILED TO ARGUE THAT THE TRIAL COURT SHOULD HAVE SENTENCED MR. GORDON FOR GROSS SEXUAL IMPOSITION AS A FOURTH DEGREE FELONY.

{¶56} Gordon argues in his sixth assignment of error that the trial court committed plain error in sentencing him for gross sexual imposition as a felony of the third degree instead of a felony of the fourth degree when the verdict form did not include the degree of the offense or any aggravating factors. Gordon argues in his seventh assignment of error that he was denied the effective assistance of counsel when trial counsel failed to argue that Gordon should have been sentenced for gross sexual imposition as a fourth degree felony.

{¶57} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings." *Klingel*, 2017-Ohio-1183, ¶ 29. "A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice." *Id.* "This Court may not reverse the judgment of the

trial court on the basis of plain error, unless appellant has established that the outcome of trial clearly would have been different but for the alleged error." *Id.*

**{¶58}** Gordon's argument is based upon *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256 and R.C. 2945.75(A)(2) . "In [*Pelfrey*], the Supreme Court of Ohio determined that '[p]ursuant to the clear language of R.C. 2945.75, a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense.'" *State v. Hasenyager,* 9th Dist. Summit No. 27756, 2016-Ohio-3540, ¶ 24, quoting *Pelfrey* at syllabus. "'Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.'" *Hasenyager* at ¶ 24, quoting R.C. 2945.75(A)(2). "Pelfrey applies when 'the presence of one or more additional elements makes an offense one of more serious degree.'" *State v. Edwards*, 9th Dist. Lorain No. 12CA010274, 2013-Ohio-3068, ¶ 34, quoting R.C. 2945.75(A).

**{¶59}** Gordon argues that, because the verdict forms in the instant matter did not state the degree of the offense or include any aggravating elements, he should have been sentenced to fourth degree felony gross sexual imposition, as that is the least degree of gross sexual imposition.

**{¶60}** Gordon was found guilty of violating three counts of R.C. 2907.05(A)(4). A violation of R.C. 2907.05(A)(4) is a felony of the third degree. R.C. 2907.05(C)(2). This Court has previously concluded that "[t]here are no additional elements that will enhance this offense to a higher degree. R.C. 2907.05 does contain other subsections, but each has their own separate elements. * * * Failure to prove any of the[] elements would have resulted in an acquittal, not a conviction of a lesser degree of gross sexual imposition." *Hasenyager* at ¶ 27, quoting *Edwards*

at ¶ 35. Thus, *Pelfrey* and R.C. 2945.75(A)(2) are inapplicable to convictions for violations of R.C. 2907.05(A)(4). *Hasenyager* at ¶ 27; *Edwards* at ¶ 36.

**{¶61}** Therefore, based upon Gordon's arguments, he has not demonstrated any error, let alone plain error. *See Hasenyager* at ¶ 27.

**{¶62}** Gordon's sixth assignment of error is overruled.

**{¶63}** With respect to Gordon's claim of ineffective assistance of counsel, as we concluded above that the trial court did not err in sentencing Gordon to a third degree felony, trial counsel likewise was not ineffective in failing to object to the trial court's sentence on that basis. *See State v. Daniels,* 9th Dist. Summit No. 26406, 2013-Ohio-358, ¶ 15.

**{¶64}** Gordon's seventh assignment of error is overruled.

### III.

**{¶65}** Gordon's first through fourth, sixth, and seventh assignments of error are overruled. Gordon's fifth assignment of error is sustained and the matter is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.